JOURNAL ENTRY AND OPINION
{¶ 1} Daryl Wells ("Wells") appeals from his convictions and sentence imposed in Cuyahoga County Common Pleas Court. Wells argues that the trial court, the prosecutor and his defense counsel violated several of his constitutional rights, the trial court erred in denying his motion for a mistrial, the trial court gave the appearance of impropriety, his convictions are not supported by the weight of the evidence, and that his sentence is contrary to law. For the following reasons, we vacate Wells' convictions.
 {¶ 2} Wells' convictions resulted from an incident that occurred on the morning of February 25, 2003. Sometime after opening a branch office of US Bank, the branch manager noticed a black plastic garbage bag near the front door. The garbage bag seemed to have a large object inside and the manager went outside to examine the item. The manager noted that the trash barrel covered the object in the bag, and that someone had duct-taped the lid to the barrel and placed a white cardboard box into the lid. The manager feared that the item was a homemade bomb, so she reentered the building to contact police.
 {¶ 3} A short time after reentering the bank, the manager received a telephone call. The caller indicated that a bomb had been placed near the front door, and demanded that money be placed into a bag and set outside the rear door of the building "within three minutes," or the bomb's detonator would be activated. The manager became alarmed and notified the people inside the bank of the threat.
 {¶ 4} One bank customer decided to leave the bank and walked towards his truck that he parked near the rear of the building. As he walked, he observed a man, later identified to be Wells, pacing the parking lot of the vacant service station behind the bank. As he drove away, the customer continued to watch Wells and even circled back to the area to observe Wells.
 {¶ 5} A cashier working the drive-through window of the fast-food restaurant located next to the vacant service station also observed Wells. The cashier thought Wells' actions were odd in view of the weather and location so she continued to watch him. The cashier observed Wells speaking on a cellular phone as he walked and also saw him peer around the service station towards the bank.
 {¶ 6} Officers arrived on the scene and spoke with the bank manager, who was in the process of escorting the bank customers past the object to a nearby meeting place. Additionally, the bank customer who had departed earlier returned to add a general description of the suspicious man he had seen in the area behind the bank. Officers then broadcast Wells' description via radio to other police units that were on their way to the scene.
 {¶ 7} Officers Alex Lozada ("Lozada") and David Potachek ("Potachek") were the first unit to arrive at the vacant service station. As the officers arrived, they called out to Wells, who observed the patrol car and then fled the area. The officers apprehended Wells, searched his person, and placed him under arrest. The officers recovered a cellular telephone, a gun that had been tucked into one of his boots, and some plastic garbage bags that had been inside his clothing. Additionally, the fast-food cashier identified Wells as the man she had seen in the vacant lot behind the bank.
 {¶ 8} Officers checked the outgoing calls from Wells' cellular phone and noticed that Wells had recently called one particular number several times. Officers traced the number to a woman names Jessica Socausky ("Socausky"). Officers checked the records for Socausky's telephone and discovered that several calls had been made that morning to the cellular telephone carried by Wells. Officers also discovered that Socausky's cellular phone had twice been used to telephone the bank branch on the morning of the incident.
 {¶ 9} Officers responded to Socausky's apartment to question her but she claimed to know nothing about the attempted bank robbery. Socausky eventually informed officers that her companion, Raymond Serrano ("Serrano") often used her cellular telephone and that he currently had it in his possession. Additionally, Socausky told police that Serrano and Wells were friends and that they had left together that morning in her car. Socausky indicated that Serrano returned shortly after noon and that he seemed nervous. Once home, Serrano proceeded to turn on the television to watch the local news and when the news reported the attempted robbery, he admitted to Socausky some criminal knowledge about the incident.
 {¶ 10} The detective assigned to the case obtained and executed a search warrant for Socausky's apartment. During the search, officers recovered large bags of marijuana, a fuse that exactly matched the fuse inserted into the false bomb, a roll of duct tape similar to the tape placed around the false bomb that contained one of Wells' fingerprints, Socausky's license plates, and an opened box with receipts that indicated the gun Wells carried had been inside the box at purchase. The receipts showed that Noemi Arroyo ("Arroyo"), the sister of Wells' girlfriend, purchased the gun. Arroyo later told police that she purchased the gun for Wells.
 {¶ 11} After his arrest, Wells gave an oral statement to the assigned detective wherein he admitted to being the man pacing in the vacant parking lot. However, Wells claimed that he had been sent there by Serrano to wait for a delivery of marijuana and that he had been set up to take the blame for the failed bank robbery.
 {¶ 12} On March 10, 2003, the Cuyahoga County grand jury indicted both Wells and Serrano. The grand jury indicted Wells with two counts of robbery with one-year firearm specifications, one count of carrying a concealed weapon, one count of having a weapon while under disability, and one count of possession of criminal tools.[1] Officers arrested Wells on the indictment on March 12, 2003, and he remained in the custody of the county jail thereafter.
 {¶ 13} At his March 13, 2003 arraignment, Wells received assigned counsel. Numerous pretrial hearings were conducted in his case, and the record reflects defense counsel often requested continuances for various reasons. The court first set the matter for trial on January 21, 2004, but defense counsel requested a continuance, which the trial court granted.
 {¶ 14} In March 2004, Wells filed a request for the appointment of new counsel for his defense; and in May 2004, Wells filed a pro se motion to dismiss the indictment for a failure to comply with the speedy trial requirements. The trial court granted Wells' request for new counsel, held an oral hearing on his motion to dismiss, and then denied the motion.
 {¶ 15} Wells' case proceeded to a jury trial on September 13, 2004. The jury convicted Wells on each count, including the firearm specifications. After obtaining a presentence report, the trial court sentenced Wells to a total term of incarceration of eight years.
 {¶ 16} Wells appeals, raising the eleven assignments of error contained in the appendix to this opinion.
 {¶ 17} In his first assignment of error, Wells argues that his "right to a speedy trial was violated when he was not brought to trial within 270 days, and was only tried after nineteen months of detention."
 {¶ 18} At both the trial court level and in his appeal, Wells argues that his right to a speedy trial had been violated on a statutory basis. He never raised his constitutional right to a speedy trial and, accordingly, Wells has waived all but plain error. State v. Chinn, 85 Ohio St.3d 548, 544, 1999-Ohio-288. Though we do not agree with Wells' assertion that his statutory right to a speedy trial was violated, we do find by plain error that Wells' constitutional right to a speedy trial was violated.
 {¶ 19} Crim.R. 52(B) states that, "[p]lain error or defect affecting substantial rights may be noticed although they were not brought to the attention of the court." Error is not plain error unless the outcome of an accused's trial clearly would have been otherwise, but for the error. State v. Nicholas (1993),66 Ohio St.3d 431, 436. The standard for plain error is whether substantial rights of the accused are so adversely affected as to undermine the fairness of the guilt determining process. Statev. Swanson (1984), 16 Ohio App.3d 375, 377. Notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Pumpelly (1991),77 Ohio App.3d 470, 475. We find such exceptional circumstances exist in this case and therefore conclude under the doctrine of plain error, Wells' constitutional right to a speedy trial was violated.
 {¶ 20} In its decision of Barker v. Wingo, (1972),407 U.S. 514, 92 S.Ct. 2182, the United States Supreme Court propounded a balancing test to determine whether a defendant's constitutional right to a speedy trial had been violated, even though the statutory time-frame had not been exceeded. State v. O'Brien,
(October 17, 1986), Ottawa C.A. No. OT-86-3, 1986 Ohio App. LEXIS 8723. In the application of this test, the behavior of both the prosecution and defense is compared and contrasted. Barker,
supra; O'Brien, supra. The test requires a court to weigh the following four factors: (1) length of delay; (2) the reason for it; (3) assertion by defendant of his right; and (4) amount of prejudice to the defendant. Barker, supra, at 530.
 {¶ 21} The first Barker factor, length of delay, weighs in favor of Wells. In interpreting the first Barker factor, the Ohio Supreme Court recognized that this factor performs a gate-keeping function, insofar as a delay approaching one year typically is required to establish "presumed prejudice," the existence of which is necessary to trigger an inquiry into the other three factors. State v. Triplett, 78 Ohio St.3d 566,1997-Ohio-182; Barker, supra, at 530. In the present case, Wells' nineteen-month delay is more than adequate to trigger a review of the other three factors.
 {¶ 22} The second Barker factor, the reason for delay, examines the justification claimed by the state for the delay.O'Brien, supra. This factor weighs both for and against Wells. The trial court record demonstrates that Wells' trial counsel requested the majority of continuances on his behalf. However, one of the reasons for this nineteen-month delay was the trial court's erroneous belief that it could hold Wells indefinitely because he had a valid parole hold from another state. The trial court stated on the record that "with a parole hold we do not have a speedy trial problem here * * *."
 {¶ 23} Additionally, the trial court granted twenty-five requests for pretrial and trial continuances between March 2003 and September 2004. Even though the majority of the continuances were made by defense counsel on behalf of Wells, a written waiver was never obtained from Wells. The trial court was aware that Wells had not signed a waiver of his right to a speedy trial and was also aware of Wells' attempts to assert his right to a speedy trial, yet the court repeatedly continued the matter for a later date. A review of the record demonstrates the unacceptable number of continuances that delayed this matter for nineteen months.
 {¶ 24} The third Barker factor, assertion by the defendant of his right, weighs in favor of Wells. On May 5, 2004, Wells orally argued that his case should be dismissed for lack of speedy trial. It was at this point that the trial court incorrectly assumed that because Wells had a parole hold, the trial court could hold him indefinitely without any violation of his right to a speedy trial.
The trial court then denied Wells' oral motion. Moreover, on May 18, 2004, Wells filed a pro se motion to dismiss for lack of a speedy trial, which the trial court denied.
 {¶ 25} The fourth and final Barker factor requires this court to consider the prejudice to Wells as a result of the nineteen-month delay between his arrest and trial. In Barker
and Doggett v. United States (1992), 505 U.S. 647,112 S.Ct. 2686, the Supreme Court identified three types of prejudice that may arise from a lengthy delay: (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility that the accused's defense will be impaired by dimming memories and the loss of exculpatory evidence. Barker,
supra, at 532; Doggett, supra, at 654; State v. Bailey,
Montgomery App. No. 20764, 2005-Ohio-5506.
 {¶ 26} In this case, neither Wells' trial or appellate counsel raised his constitutional right to a speedy trial. However, a review of the record demonstrates the existence of prejudice in the form of oppressive pretrial incarceration and anxiety and concern of the accused.
 {¶ 27} In Barker the Supreme Court discussed the societal disadvantages of lengthy pretrial incarceration and the more serious disadvantages for the defendant who cannot obtain his release.
"The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare for his defense. Imposing these consequences on anyone who has not yet been convicted is serious." Id. at 532-533.
 {¶ 28} In the present case, officers arrested Wells on March 12, 2003 but was not brought to trial until September 13, 2004, nineteen months after his arrest. During this nineteen-month period, Wells remained in the custody of the county jail, Wells repeatedly asserted his rights to a speedy trial, and the trial court granted twenty-five pretrial and trial continuances. We find that this nineteen-month delay of an individual seeking to enforce his right to a speedy trial, without the existence of a speedy trial waiver is unreasonable and constitutes oppressive pretrial incarceration.
 {¶ 29} Moreover, the above-quoted Barker passage demonstrates the possible anxiety and concern of an accused individual who remains in custody while awaiting trial. What is also persuasive is Wells' repeated assertion of his right to a speedy trial. A repeated assertion of a right, such as we have here, demonstrates that an accused is both concerned and anxious about the matter.
 {¶ 30} The recently decided case of State v. Boyd, Ross App. No. 04CA2790, 2005-Ohio-1228 appears on its face, to go against this Court's finding. In Boyd, the appellate court found that "although the state acted slowly in this case, we conclude that the seventeen-month delay between indictment and arrest was not so protracted or intolerable as to warrant relief absent some particularized trial prejudice." Id. at ¶ 15. However, a comparison of the facts in Boyd to the facts of this case make the distinction easy.
 {¶ 31} The primary distinction between Wells and Boyd is that the defendant in Boyd was not in custody during the seventeen-month delay. A grand jury indicted Boyd, and later a warrant was issued for his arrest. He was not arrested on the outstanding warrant for seventeen months and therefore could not have suffered oppressive pretrial incarceration. Additionally, Boyd had no knowledge of the indictment against him and therefore could not have suffered anxiety and concern. Lastly, Boyd never alleged that the delay impaired his ability to defend himself.
 {¶ 32} Even a cursory comparison of the facts of Boyd to the facts of this case demands a different outcome. Wells spent nineteen months in the custody of the county jail; he suffered from the stresses and anxiety of being incarcerated; he repeatedly asserted his right to a speedy trial; and the trial court continued his trial several times. Morever, Barker
imposes a standard that "necessarily compels courts to approach speedy trial cases on an ad hoc basis." Barker, supra, at 530.
 {¶ 33} Accordingly, we find that the fourth Barker factor weighs in favor of Wells.
 {¶ 34} Application of the four-part Barker v. Wingo test to the facts of this case demonstrates that the cumulative effect of the delay resulted in an unreasonable infringement of Wells' constitutional rights. Therefore, upon analysis of the facts in this case, we find that Wells was deprived of his constitutional right to a speedy trial, notwithstanding the technical compliance of the state with the speedy trial statutes.
 {¶ 35} While we have noted that the trial court ultimately has control of its docket, we also note that it is incumbent on both the State of Ohio and counsel for the defendant to raise issues involving excessive pretrial detention.
 {¶ 36} The cumulative effect of the delays warrants the remedy of dismissal required by R.C. 2945.73. See O'Brien,
supra.
 {¶ 37} Wells' first assignment of error is sustained. {¶38} Our analysis of the first assignment of error renders Wells' remaining assignments of error moot.
 {¶ 39} Judgment of the Cuyahoga County Common Pleas court is vacated and Wells is ordered discharged.
It is ordered that appellant recover of appellee costs herein taxed.
The court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sean C. Gallagher, P.J., concurs.
 Kenneth A. Rocco, J., Dissents (See Separate DissentingOpinion).
 Appendix A Assignments of Error:
 "I. The defendant's right to a speedy trial was violated whenhe was not brought to trial within 270 days, and was only triedafter nineteen months of detention. II. Mr. Wells' right toconfront the witnesses against him was violated when the hearsaystatement of Raymond Serrano was introduced through JessicaSocauscy.
 III. The court's decision finding the defendant guilty ofidentity fraud was not supported by sufficient probative evidenceand was against the manifest weight of the evidence.
 IV. The defendant was denied his constitutional right to afair trial when the court erred in failing to immediately strikethe inadmissible and unfairly prejudicial responses of twowitnesses.
 V. The defendant was denied his right to effective assistanceof counsel when defense counsel failed to protect his rightsbefore and during trial.
 VI. The defendant was denied his constitutional right to afair trial because of prosecutorial misconduct during the trialand at closing argument that unfairly prejudiced the defendant.
 VII. The trial court erred in denying the defendant's motionfor a mistrial after the defendant objected to the jury's hearingof prejudicial information and after the defendant was repeatedlyremoved from the courtroom in the presence of the jury.
 VIII. The defendant's right to due process was violated whenhe was forced, over his objections, to sit before the jury attrial wearing prison sandals and an ill-fitting suit.
 IX. The defendant's right to due process was violated when thecourt conducted significant and crucial proceedings in hisabsence before he was brought into the courtroom in the morningduring the trial and removed him from the courtroom withoutadequate cause on two occasions.
 X. The court erred in failing to remove her "good friend" fromthe jury pool, despite the appearance of impropriety.
 XI. The failure to notify appellant that he would be subjectto post-release control after release from prison constitutedprejudicial and reversible error and requires a new sentencinghearing."
[1] The state eventually dismissed the other specifications attached to Wells' indictment.
 DISSENTING OPINION