[Cite as *State v. Marshall*, 2022-Ohio-3795.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 20AP-394 |
| v. | : | (C.P.C. No. 17CR-6842) |
| Cottrell Marshall, Jr., | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on October 25, 2022

**On brief:** *G. Gary Tyack,* Prosecuting Attorney, and *Darren M. Burgess*, for appellee. **Argued:** *Darren M. Burgess.*

**On brief:** *Bellinger & Donahue,* and *Kerry M. Donahue*, for appellant. **Argued:** *Kerry M. Donahue.*

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Cottrell Marshall, Jr., appeals the July 27, 2020 judgment of the Franklin County Court of Common Pleas following a jury trial, and asserts five assignments of error with the trial court's judgment:

> I. The veridct [sic] was against the sufficiency of the evidence.
>
> II. The guilty findings were against the manifest weight of the evidence.
>
> III. The State of Ohio did not establish that sexual activity or sexual conduct occurred in specific instances or on specific dates in Franklin County, Ohio, and thus the court lacked jurisdiction and venue was improper.
>
> IV. The Court should have stricken the testimony of witness RC as it was more prejudicial than probative and was highly

prejudicial as it demeaned counsel and appellant denying due
process right to a fair trial.

V. The jury instruction as to accomplice testimony was plain
error.

After a thorough review of the briefs, arguments, and record, we conclude that none of appellant's arguments have merit, and affirm his convictions and sentences.

{¶ 2} Plaintiff-appellee, State of Ohio, contended that Marshall and several codefendants were pimps and operated a human trafficking and prostitution ring, as well as dealing crack cocaine and heroin, during the period between 2012 through 2015. The state argued that he operated a prostitution ring "in the hotels on 161 near I-71." (Tr. at 442.) Marshall and his co-defendants allegedly used a website called Backpage.com—which works "like craigslist or Facebook Marketplace"—to advertise "dates" with the women he trafficked. *Id.* at 443. Marshall and his co-defendants allegedly purchased prepaid debit cards to post the advertisements.

{¶ 3} Marshall contended that these assignations were normal dates, but witness S.W., amongst others, described them as "a call with a john. A john is a guy that is going to call the number that's posted on your ad and he's going to see if you're available for a certain time and then they pay for the hour or the half an hour with you, and in -- in all -- it's -- the purpose is mainly to just have sex or -- or whatever that other person prefers. More than likely it's sex." *Id.* at 467.

{¶ 4} Several co-defendants, police officers, johns, and trafficking victims testified at trial. Multiple trafficking victims testified that Marshall collected money for organizing these dates and allowing them to occur, ranging from $60 up to $2,000 on at least one occasion. At times they would give him all money collected, but on other occasions they would get to keep some of it after giving Marshall money in exchange for drugs. Witnesses also testified they were assaulted by Marshall and his co-defendants if they did not listen to him, and that drug withdrawal, sleep deprivation, and threats were used to control them and run the enterprise.

{¶ 5} Marshall's co-defendant and ex-girlfriend Michelle Martin entered into an agreement with the state, pleaded guilty to reduced charges, and testified that in about 2015, she began to live with him in hotel rooms on "the north side, Delaware, Worthington, Westerville," and helped him run the prostitution ring. *Id.* at 859. She indicated they

usually booked two rooms, and that "me and [Marshall] would have one and the girls would have one * * * [s]o they could do dates." *Id.* at 853. She confirmed that while she often booked the rooms using prepaid debit cards on Priceline.com, Marshall paid for those cards. She also testified she would assist the trafficking victims in posting ads on Backpage.com using prepaid debit cards, but that Marshall directed which ads would be placed and when. She confirmed that Marshall ultimately financed the online advertisements, affirming that "without [Marshall] and his money, they can't post the ads." *Id.* at 1008. She also confirmed that Marshall charged the trafficking victims for "[t]heir room, hygiene, cigarettes, food, gas money, anything, everything," and that he controlled them with drugs, debt, sleep deprivation, and violence. *Id.* at 1009. She specifically indicated that Marshall kept a firearm, and that while he was soft-spoken "you would probably get slapped if you didn't listen [to him]." *Id.* at 881. Martin also testified that Marshall hit her on several occasions, and that at one point "he just freaked out and punched me in my nose and made my nose bleed and I had two black eyes for a week." *Id.* at 1006. Martin identified Marshall's "favorite" girls as "[T]" and "[R]," and that he liked them because they made more money than the others and were controllable with drugs. She indicated, though that R didn't "keep her mouth shut" and that she once saw Marshall "jerk her out of bed * * * by her hair." *Id.* at 868-69. Martin was able to specifically identify at least three women who prostituted for Marshall, identified several others whom he provided drugs and at least intended and attempted to pimp, and several men who served the enterprise in various roles—including Marshall's brother and trial co-defendant Jeffrey Marshall aka "Black," who Marshall sometimes left in charge of the victims and who sometimes collected money from the victims after dates.

{¶ 6} Other witnesses provided more details. M.W., one of the alleged trafficking victims, testified she got involved with Marshall's group to satisfy her heroin dependency but became trapped once they took control over her phone. She testified that Marshall began posting Backpage.com advertisements of her without her knowledge and went on to describe the prostitution scheme that kept women under Marshall's control. Another alleged victim, T.C., related that she became addicted to opiates as a result of pain prescriptions for workplace injuries, but she eventually began using heroin and crack, and began soliciting to provide for her drug addiction. She and her husband began living in extended-stay hotels in Columbus located on S.R. 161, and first met Marshall when he sold

drugs to them. But she eventually began working as prostitute for Marshall on and off at hotels in that same area during the period between 2012 and 2015 as a way to obtain drugs. She confirmed that her dates were arranged by ads on Backpage.com obtained using prepaid debt cards paid for by Marshall, and that Marshall or other alleged dealers that she owed money to would tell her when to post ads. She provided some financial details of Marshall's prostitution ring, indicating that at various times there were at least two and as many as eight women being pimped by him, and describing how she had earned over $1,000 in one day but "had nothing to show for it" because Marshall collected the money she earned as a payment for drugs he supplied. *Id.* at 1046-47. She also confirmed that she had seen Marshall hit other trafficking victims and "saw him strangle a girl one time," but Marshall did not hit her because she "did what [she] was supposed to do." *Id.* at 1050. She confirmed Martin's role in the operation, and indicated that the men in the operation would "protect the girls and * * * would also watch us"; meaning they would wait in the bathroom during dates, "because the guy - - the person doing the date would be intimidated if they saw men." *Id.* at 1054-57.

{¶ 7} Sara Wilson testified she met Marshall in 2011, that he was her drug dealer, and that she was a "middleman" and a "hookup" for some of Marshall's drug customers. *Id.* at 474. She indicated she was the person who initially suggested the human trafficking scheme to Marshall:

> We started staying in the hotels around 161 and there was a lot of girls in the hotels and at first I was just selling the drugs out of there to a lot of the girls that were in the hotel doing their own thing with the whole Backpage and I -- I -- I -- I mentioned that we could -- we could do it too. * * * I had mentioned [to Marshall] how I had done it before and how I had made money. The -- I was a lot more sober before, though, than I was this time around. So the -- the price of the dates weren't like the same anymore and stuff like that just because, like, once I got back on drugs you start looking bad and stuff[.] * * * But then throughout the years, like, some of the girls would go and come. * * * So there was -- there was [R.C.]. Then there was [R.S.]. There was [D]. There was [M], [T]. Those are the main girls that was around me when I was -- when I was out there.

*Id.* at 474-76. Wilson also testified about the design of the Backpage.com advertisements, the use of prepaid debit cards to purchase ads, and that Marshall was the source of the money used to buy the cards. She confirmed that Marshall "slapped" R.C. and indicated

that he was harder on her than the rest of the victims, in part because she did not bring in enough money. *Id.* at 480-81. She also testified that the amount of money the victims owed to Marshall was always "outrageously more than the amount that we were receiving," that Marshall often provided them just enough heroin to prevent them from getting sick, and she was "never" out of debt to Marshall. *Id.* at 482. Finally, she described one of the men in the operation as "our babysitter * * *. He sat there to make sure we weren't doing anything we wasn't supposed to * * * [because Marshall] didn't sit with us all day. He would be running around and [the 'babysitter'] would be watching us." *Id.* at 493-94.

{¶ 8} Columbus Police Officer Gillespie testified that while he was working patrol in the area of the hotels in February 2015, he encountered a bruised, beaten, and frightened M.W., which led him to a hotel room in which he found several of the other participants in the enterprise. R.C. testified when she first met Marshall to purchase drugs that he taught her how to prostitute using Backpage.com, he paid for the ads, he beat her up "a lot like I was a grown man," all money she brought in from her dates was given to Marshall in exchange for drugs, and that women who did not surrender the money would be beaten. *Id.* at 1164. James Windhorst admitted that he paid S.W. and R.S. for sex after seeing ads for their services on Backpage.com and eventually began to "take care" of S.W. *Id.* at 561. Windhorst specifically testified about one occasion while R.S. was at his home and Marshall came "kicking at my door" looking for a "scared" R.S. and did not stop until police arrived. *Id.* at 563-64. Columbus Police Detective Boyle summarized his involvement in investigating the trafficking enterprise at the S.R. 161 and Morse Road hotel through his participation in the Human Trafficking Task Force, which involved assisting in prostitution stings and drug buys, using Backpage.com to identify human trafficking victims who were prostituting. He specifically identified Marshall as the "head" of one of the human trafficking operations working out of the hotels in that area at the time, which he was able to confirm at the time through surveillance, the execution of a search warrant on Marshall's residence, and interviews with the women involved. *Id.* at 1256. At the end of the trial, the jury found Marshall guilty of one first-degree felony charge of Engaging in a Pattern of Corrupt Activity, three first-degree felony charges of Trafficking in Persons, two third-degree felony charges of Compelling Prostitution, and three fourth-degree felony charges of Promoting Prostitution. He was eventually sentenced to a total of 40 years' incarceration, and this timely appeal followed.

{¶ 9}     Marshall first contends that the jury's verdicts of guilt were not supported by sufficient evidence.  " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds*, quoting *Black's Law Dictionary* 1433 (6th Ed.1990).  "[S]ufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*, quoting *State v. Robinson*, 162 Ohio St. 486 (1955).  "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1999), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307 (1979).  The essential elements of the crimes for which Marshall was indicted and convicted are as follows:

- *R.C. 2905.32, Trafficking in Persons*—knowingly recruit, lure, entice, isolate, harbor, transport, provide, obtain, or maintain, an individual in involuntary servitude if the offender knows that individual will be compelled to engage in sexual activity for hire. "Compulsion" need not be openly displayed or physically exerted, and may be shown if the state proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud.

- *R.C. 2907.21, Compelling Prostitution*—knowingly compel another to engage in sexual activity for hire. "Compulsion" need not be openly displayed or physically exerted, and may be shown if the state proves that the victim's will was overcome by force, fear, duress, intimidation, or fraud.

- *R.C. 2907.22, Promoting Prostitution*—knowingly maintain or have an interest in a brothel, supervise prostitutes, transport persons to facilitate sexual activity for hire, or induce or procure another to engage in sexual activity with the purpose of facilitating a violation of this statute.

- *R.C. 2923.32(A)(1), Engaging in a Pattern of Corrupt Activity*—No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity. An "enterprise" includes any individual, sole proprietorship, partnership, limited partnership, corporation,

trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity, and includes illicit as well as licit enterprises. "Conduct" requires an element of direction regarding the enterprise, and "participation" requires taking some part in directing the enterprise's affairs. A "pattern" means two or more incidents of corrupt activity, and as it relates to this case "corrupt activity" is engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in any violation of the Compelling Prostitution and Promoting Prostitution statutes when the violation or combination of violations involve proceeds, payments, claims, or value that exceeds $1,000, or any violation of the Trafficking in Persons statute to the extent the violation is not based solely on the same conduct that constitutes corrupt activity in violation of the Compelling Prostitution and Promoting Prostitution statutes. Engaging in a pattern of corrupt activity is a strict liability offense.

{¶ 10} We conclude that the testimony from Martin, M.W., S.W., R.C., and Detective Boyle provided sufficient evidence for appellant's convictions. Martin and M.W. both gave ample testimony establishing the elements of trafficking in persons, promoting prostitution, and compelling prostitution related to each of the trafficking victims. Detective Boyle and Martin, amongst others, gave clear evidence establishing the existence of a criminal enterprise, and the testimony of others established more than two specific incidents of corrupt activity in the form of compelling and promoting prostitution. We cannot say the state failed to meet its burden as to any of these offenses, and it almost goes without saying that a rational trier of fact could have found all of the offenses proven beyond a reasonable doubt. Appellant's first assignment of error is overruled.

{¶ 11} Marshall next contends that the manifest weight of the evidence presented at trial did not support his convictions. Whether a finding of guilt is supported by the "manifest weight" of the evidence requires evaluation of the credibility and weight of the testimony, which are questions primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The jury, or the court in a bench trial, may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Therefore, "[w]hen a court of appeals

reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 12} But this is not such a case. Taken as a whole, the testimony and record contains ample evidence of Marshall's responsibility for all alleged crimes, and the fact that the jury chose to believe witnesses whose memories were allegedly clouded by drug abuse does not render his convictions against the manifest weight of the evidence. Accordingly, Marshall's second assignment of error lacks merit and is overruled.

{¶ 13} In his third assignment of error, Marshall asserts that the trial court lacked jurisdiction and that venue was improper. His general argument here is not that the sexual conduct or sexual activity offenses did not occur within the time frame set within the indictment, or that the actions occurred in a different jurisdiction, but rather that the state failed to prove the specific dates and specific times that the alleged offenses occurred and also failed to specifically prove that they occurred in Franklin County.

{¶ 14} R.C. 2941.03(E) provides that "[a]n indictment * * * is sufficient if it can be understood there from * * * [t]hat the offense was committed at some time prior to the time of finding of the indictment." And in *State v. Sellards,* 17 Ohio St.3d 169, 171 (1985), the Supreme Court of Ohio observed that "precise times and dates are not essential elements of offenses. Thus, the failure to provide dates and times in an indictment will not alone provide a basis for dismissal of the charges. A certain degree of inexactitude of averments, where they relate to matters other than elements of the offense, is not *per se* impermissible

or necessarily fatal to a prosecution." And this court has held that "[p]ursuant to R.C. 2941.08, stating the time of the offense imperfectly does not affect a judgment where time is not of the essence of the offense." *State v. Acquista*, 10th Dist. No. 95APA04-431 (Dec. 12, 1995), 1995 Ohio App. LEXIS 5476, **24-25. Quoting *Tesca v. State*, 108 Ohio St. 287 (1923), we observed that it has long been the law in Ohio that " 'in a criminal charge the exact date and time are immaterial unless in the nature of the offense exactness of time is essential. It is sufficient to prove the alleged offense at or about the time charged.' " *Acquista* at *25 quoting *Tesca*, paragraph one of the syllabus.

{¶ 15} Additionally, the Ohio Constitution, Article I, Section 10 provides an accused the right to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." The section "fixes venue, or the proper place to try a criminal matter." *State v. Headley*, 6 Ohio St.3d 475, 477 (1983), and a "conviction may not be had in a criminal case where the proof fails to show that the crime alleged in the indictment occurred in the county where the indictment was returned." *State v. Nevius*, 147 Ohio St. 263 (1947), paragraph three of the syllabus. "[I]t is not essential that the venue of the crime be proven in express terms, provided it be established by all the facts and circumstances in the case, beyond a reasonable doubt, that the crime was committed in the county and state as alleged in the indictment." *State v. Dickerson*, 77 Ohio St. 34 (1907), paragraph one of the syllabus. In *State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, ¶ 19, the Supreme Court observed that "[t]he state has the obligation to ensure the proper venue within the indictment, for the indictment puts the defendant on notice and the state to its proof," but also noted that "[t]he General Assembly has given the state considerable flexibility with respect to establishing venue when the state cannot determine the precise location at which the offense took place. *See, e.g.*, R.C. 2901.12(G), which allows for an offense that was committed in any of two or more jurisdictions to be charged in any of those jurisdictions." Moreover, this court has recently taken judicial notice of the boundaries of Franklin County. *State v. Rohrig*, 10th Dist. No. 20AP-579, 2021-Ohio-3903, ¶ 4, fn. 1 (quoting prior cases and judicially noticing "the geographic fact that the territorial boundaries of Westerville extend into both Franklin County and Delaware County. 'Courts may take judicial notice of geographical facts which are matters of common knowledge, particularly those existing within the jurisdiction of the court' "). (Internal quotations omitted.)

{¶ 16}  The state responds that the indictment alleged actions between November 1, 2012 and February 28, 2015, that Marshall stipulated to records from Backpage.com and local hotels, which established both that rooms in Worthington and Columbus were rented during February and March that were allegedly used for prostitution, and Marshall and his co-defendants paid for prostitution advertisements on Backpage.com during the preceding months.  The state also relies on the testimony of Detective Boyle who indicated that the hotels used by Marshall and his co-defendants were "around 161, Morse Road, somewhat 23 and 270 area."  (Tr. at 1242.)  Moreover, the record does contain specific testimony describing an incident where a john nicknamed "Millionaire Mike" paid Marshall $2,000 to "have" witness S.W.  *Id.* at 551.

{¶ 17}  The state was not required to provide specific dates or times of the activities that led to his convictions, as it definitely did provide evidence that those activities occurred within the time frame established in the indictment.  Moreover, the state provided evidence that activities occurred at specific addresses in Columbus and Worthington that are within Franklin County.  Even though no particular witness uttered the words "Franklin County," Marshall has not established that any of the offenses occurred in a different county.  We therefore overrule Marshall's third assignment of error.

{¶ 18}  Marshall next contends that the testimony of a state witness should have been excluded, and that the improperly admitted testimony was crucial to the state's case. Marshall argues that the court should have stricken the testimony of R.C., a witness for the state who was hostile and uncooperative on the stand when Marshall's counsel cross-examined her regarding her criminal history and prior inconsistent statements.  *Id.* at 1188-99.  R.C. refused to answer counsel's questions regarding her criminal history and cursed at Marshall's counsel multiple times, leading the court to call a recess.

{¶ 19}  Ohio Evid.R. 403(A) provides that exclusion of relevant evidence is mandatory where the "probative value is substantially outweighed by the danger of unfair prejudice."  Although the terms of Evid.R. 403(A) are "mandatory," a trial court has broad discretion in determining whether to admit or exclude evidence.  *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66 (1991).  Thus, "[a]bsent an abuse of discretion that materially prejudices a party, the trial court's decision will stand."  *Id.*

{¶ 20} Evid.R. 403 manifests a definite bias in favor of admissibility. First, the Supreme Court instructs that "[e]mphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *State v. Crotts,* 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24. And this court has held that "[a]lthough evidence may be damaging or harmful to the defendant, that does not necessarily mean that the evidence is prejudicial under the rules of evidence. Only when the evidence induces the jury to decide the case on an improper basis, i.e., an emotional one, does the defendant suffer material prejudice." *Kelm v. Conkel*, 10th Dist. No. 16AP-494, 2017-Ohio-8545, ¶ 10. Second, the dangers or considerations must "substantially" outweigh probative value before evidence should be excluded. "[R]elevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

{¶ 21} Applying the foregoing analysis to the record, Marshall's contention lacks merit. His counsel was able to establish that R.C. had entered into a pretrial plea bargain that had revoked the remainder of her postrelease control, and while R.C. refused to answer questions about her criminal history, Marshall's counsel was able to get that evidence in the record by stipulation. Marshall sought to strike her testimony in its entirety the following day but the court denied the motion, noting that "the defendant [sic] did not refuse entirely to answer questions posed by [Marshall's counsel]," and that counsel "withdrew the line of questioning regarding the witness' criminal history and came to a stipulation with the State." (Tr. at 1235.) Accordingly, it was well within the discretion of the court to deny Marshall's motion to strike testimony—the fact that a state witness became hostile and rude to defense counsel is not in and of itself a sufficient basis to establish a due process violation, and the decision to stipulate to the witness' prior convictions rendered the witness' actions wholly nonprejudicial. We therefore overrule Marshall's fourth assignment of error.

{¶ 22} Finally, Marshall asserts that the trial court committed plain error by improperly instructing the jury on accomplice liability. He notes that the transcript indicates that the court's verbal instructions used an incorrect word—specifically, the court apparently instructed the jurors that "the admitted or claimed complicity of a witness may

affect his credibility and make his testimony subject to grave *suspension* and require that it be weighed with great caution," using the word "suspension" rather than the correct "suspicion." (Emphasis added.)  *Id.* at 1494-95. Marshall did not object when the instruction was given.

{¶ 23} In general, an accused's failure to raise an issue in the trial court "forfeits all but plain error, and a forfeited error is not reversible error unless it affected the outcome of the proceeding and reversal is necessary to correct a manifest miscarriage of justice." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 3. In *Rogers*, the Supreme Court observed:

> Crim.R. 52(B) affords appellate courts discretion to correct "[p]lain errors or defects affecting substantial rights" notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court. However, the accused bears the burden of proof to demonstrate plain error on the record, and must show an error, *i.e.*, a deviation from a legal rule that constitutes an obvious defect in the trial proceedings. However, even if the error is obvious, it must have affected substantial rights, and we have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. The accused is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.
>
> But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have admonish[ed] courts to notice plain error with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.

(Emphasis sic.) (Internal citations and quotations omitted.) *Id.* at ¶ 22-23. Moreover, this court has held that we "will reverse on plain error based on an erroneous jury instruction only upon a showing that the outcome clearly would have been different absent the error." (Internal citations and quotations omitted.) *State v. Mankin*, 10th Dist. No. 19AP-650, 2020-Ohio-5317, ¶ 18.  On review, it seems clear from the transcript that either the trial court misspoke or the court reporter mistranscribed a word in the instructions.  But the state observes that the written jury instructions—which were provided to the jury and the jury was invited to review even as the instructions were being read by the judge—were

correct, and more importantly, that Marshall has not demonstrated or even attempted to demonstrate that the court's error had any effect on the outcome of the case. We agree— even if the court's mistake was "plain," under these circumstances we cannot say that it was prejudicial to Marshall or undermined his right to a fair trial, and therefore does not rise to the level of plain error. Accordingly, Marshall's fifth assignment of error is overruled.

{¶ 24} For all these reasons, Marshall's five assigned errors are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

MENTEL and McGRATH, JJ., concur.

———————————