[Cite as *State v. Blacker*, 2024-Ohio-5611.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-320 |
| | | (C.P.C. No. 21CR-993) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Nathanial C. Blacker, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 26, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellant. **Argued:** *Michael Rogers*.

APPEAL from the Franklin County Court of Common Pleas

JAMISON, J.

{¶ 1} Defendant-appellant, Nathanial C. Blacker, appeals a judgment of the Franklin County Court of Common Pleas convicting and sentencing him for one count of felonious assault with an accompanying repeat violent offender specification. For the following reasons, we affirm that judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Blacker and E.T., who goes by the name "Betsy," met in January or February 2021 and started dating. (May 1, 2024 Tr. Vol II at 148.) According to Betsy, almost immediately after the couple met, Betsy moved in with Blacker at his residence on South Roys Avenue in Columbus. Blacker and Betsy occupied one bedroom in the South Roys house. At least three other individuals also lived at the South Roys house.

{¶ 3}    Blacker and Betsy agree that in the early morning of March 5, 2021, Blacker stabbed Betsy in the living room of the South Roys house.  However, Blacker and Betsy have drastically different recollections of the events that led up to the stabbing.

{¶ 4}    Betsy recalls that she was sitting on the floor of the living room coloring at the coffee table.  Two other individuals, J.W. and A.H., were also in the living room.  Blacker came into the living room and "said something about [Betsy] using a cord of his or something like that."  (Tr. Vol. II at 249.)  Betsy replied "He had my lighter, you know, or whatever.  And he kind of, like, freaked out, had a little tantrum; and I mocked him, you know."  *Id.*  At that point, Blacker punched Betsy "harder than [she'd] ever been hit before."  *Id.*  The blow broke one of Betsy's teeth and flipped her backwards.  She ended up on her stomach, covering her head with her hands, as Blacker repeatedly stabbed her.  In total, Blacker stabbed Betsy 12 times in her back, 2 times on the side of her neck, and 3 times on the back of her head.  As Blacker stabbed Betsy, he called her a "cheating bitch."  *Id.* at 251, 254.

{¶ 5}    After punching and stabbing Betsy, Blacker helped her stand up and walked her into the bathroom.  Blacker cut Betsy's shirt and bra off her, and he told her that he was going to stitch up her stab wounds.  While Blacker and Betsy were in the bathroom, another resident of the South Roys house called 911.  The 911 caller, who did not identify herself, reported that, "there's this girl, I think her name's Betsy, she's been stabbed. * * * Nate was going to bandage her up because he did it."  (State's Ex. C at 0:00:22.)  When asked for the assailant's name, the caller answered, "Nate Blacker."  *Id.* at 0:00:59.

{¶ 6}    Police officers from the Columbus Division of Police arrived at the South Roys house at 2:55 a.m. on March 5, 2021.  Video from the body-worn camera of Officer Joshua Bell shows Officer Bell open the unlocked front door of the South Roys house while yelling, "It's the Columbus police!"  (State's Ex. D1 at 0:00:23.)  Blacker immediately appeared at the top of the staircase in the entryway of the house.  Officer Bell told Blacker to "come down here."  *Id.* at 0:00:28.  When Blacker reached the foot of the stairs, he told Officer Bell that Betsy was upstairs.  Blacker then asked Officer Bell if Officer Bell wanted his knife.  Officer Bell told him "no," and had him walk backwards out of the house with his hands up.  *Id.* at 0:00:39.  At the threshold of the house, another officer cuffed Blacker.  Blacker turned to Officer Bell and said, "There's an intruder in the house up there.  I don't know what her

name is. She been here f***** -- she started stealing stuff out of the house and, uh, she tried to attack me, and I stabbed her." *Id.* at 0:00:51.

{¶ 7} Officer Bell then entered the South Roys house and found Betsy in an upstairs hallway. Betsy did not have any shirt on, and she was crying and covering her breasts with her arms and hands. Officer Bell asked Betsy where she was stabbed, and she responded, "Everywhere." *Id.* at 0:01:24; Tr. Vol. II at 316. Officer Bell questioned Betsy about how she knew Blacker. Betsy stated that she "was dating him for a little while." (State's Ex. D1 at 0:02:45.) Officer Bell then asked Betsy, "Did you guys live together or anything?" *Id.* at 0:02:48. Betsy's reply, while partially indecipherable, ended with "staying here." *Id.* at 0:02:51. Officer Bell asked, "You were staying here with him?" *Id.* at 0:02:52. Betsy responded, "Yeah." *Id.* at 0:02:53.

{¶ 8} Right before the medic arrived, Officer Bell reached out and grabbed a pocketknife from Betsy's jeans pocket and tossed it to the floor. As he was doing that, Officer Bell told Betsy, "I'm just going to take this knife from you, okay?" *Id.* at 0:03:04. Betsy said, "Yeah." *Id.* at 0:03:05.

{¶ 9} The medic then guided Betsy out of the house and to the ambulance. According to the medic, Betsy told him that "she was asleep when [the] stabbing started and woke to her bleeding." (Tr. Vol. II at 337.) When later asked about this statement, Betsy did not recall making it.

{¶ 10} Officer Bell followed the ambulance to the hospital, where he again spoke with Betsy. While she was receiving treatment in the hospital trauma bay, Betsy told Officer Bell that, "I was sitting on the floor on my knees at the coffee table. I was going to color. I was talking to my friend. My friend was on the couch. He came out. That's when the stuff -- I said something about, he had my lighter, or something. That's when he flipped out." (State's Ex. D2. at 0:00:41.)

{¶ 11} Two individuals—J.W. and A.H.—saw Blacker stab Betsy. A.H.'s memory of the stabbing is consistent with Betsy's version of events. In the early morning of March 5, 2021, A.H. was sleeping on the recliner in the living room of the South Roys house. The sounds of two people arguing woke A.H. up. A.H. saw Blacker punch and then stab Betsy as Betsy sat on the floor. After assaulting Betsy, Blacker took her into the bathroom.

{¶ 12} According to Blacker, Betsy never resided at the South Roys house. He acknowledged, however, that when he and Betsy were dating, she stayed with him at the South Roys house for up to seven days at a time. Blacker claimed that Betsy stole some clothes from another resident of the South Roys house, and she took hearing aids that had belonged to the prior owner of the house. When Blacker caught Betsy stealing, he told her that she had to leave. Blacker threw Betsy out of the house on either March 1 or 2, 2021.

{¶ 13} On March 5, 2021, when Blacker arrived home, he saw Betsy in the living room going through a white bag. Blacker walked past her and went into his bedroom. Betsy came into the bedroom and berated Blacker for ignoring her when he entered the house. Blacker told her, "We're not together. You need to be out of here, you know. You're not welcome at the house." (Tr. Vol. III at 456.) Betsy then began to dig through a bag Blacker had in his bedroom. Blacker said, "[Y]ou can't be doing this. Man, you got to go." *Id.* at 456-57. At that point, Betsy pulled a knife and tried to cut Blacker. Blacker smacked the knife out of Betsy's hand and into the hallway. When deflecting the knife, Blacker sliced his finger.

{¶ 14} Betsy left the bedroom, presumably to retrieve her knife. Blacker remained in the bedroom and patched up his finger with a piece of furnace tape. While Blacker was alone in his bedroom, he heard Betsy in the living room talking with J.W. Betsy said to J.W., "I should just take that bat in there and bust his brains all over the wall." *Id.* at 457.

{¶ 15} Blacker walked into the living room and told Betsy "to get the F out of there." *Id.* at 460. Betsy then "brandished" a miniature baseball bat and said, "I'm not going anywhere. Make me leave." *Id.* Blacker tried to take the bat from Betsy, but she jerked it back. Blacker then began stabbing Betsy. He continued to stab her until she dropped the bat. Once Blacker stopped stabbing Betsy, she fell to the floor.

{¶ 16} As Betsy was lying bleeding on the living room floor, Blacker told her, "Whatever you do in the next five to ten minutes is going to determine whether you live or die in this house." *Id.* at 462. Blacker and J.W. helped Betsy to the bathroom. After taking off Betsy's shirt, Blacker washed her wounds with cold water. Blacker was trying to slow the bleeding when the police arrived.

{¶ 17}  On March 12, 2021, Blacker was charged with one count of felonious assault, a second-degree felony in violation of R.C. 2903.11, with an accompanying repeat violent offender specification pursuant to R.C. 2941.149(A).  Blacker pleaded not guilty.

{¶ 18}  Trial was scheduled to begin on July 12, 2021.  However, on that date, the trial court announced that it was sua sponte raising the issue of Blacker's competency to stand trial.  During the July 12, 2021 hearing, Blacker declared that he could not be Nathanial Blacker because Nathanial Blacker was dead.  Blacker claimed he was "actually a trustee for the dead traveler trust" and accused the court of "trying to make me stand in for this dead man."  (July 12, 2021 Tr. at 11.)  According to Blacker, Nathanial Blacker had "been dead since 2009," and Blacker could prove Nathanial Blacker's death through a financing statement on file with the Ohio Secretary of State.  *Id*. at 13.  Based on Blacker's behavior and representations, the trial court determined that it would order an evaluation of Blacker's mental condition pursuant to R.C. 2945.371(A).  The trial court ordered Blacker to undergo the evaluation in an entry dated July 27, 2021.

{¶ 19}  A licensed clinical psychologist evaluated Blacker's capacity to understand the nature and objective of the proceedings against him and assist in his defense.  Due to Blacker's lack of cooperation with the evaluation, the psychologist was unable to reach an opinion regarding whether Blacker was able to understand the nature and objective of the proceedings against him.  The psychologist, however, determined that Blacker did not have the capacity to assist in his defense.  During the evaluation, Blacker was argumentative, and his attention and concentration were poor.  Blacker expressed paranoid beliefs regarding the role and responsibilities of his attorney and the judge.  He was not able to present information in an organized and linear manner.  He became defensive whenever the psychologist referenced his legal name, claiming that he was not Nathanial Blacker and Nathanial Blacker was dead.

{¶ 20}  Although the psychologist found Blacker legally incompetent to stand trial, he also found a substantial probability that Blacker could be restored to competency if provided with a course of treatment.  The psychologist recommended that Blacker receive inpatient treatment at Twin Valley Behavioral Healthcare ("Twin Valley").

{¶ 21}  On September 8, 2021, the trial court held a hearing regarding Blacker's competency to stand trial.  The psychologist who completed the evaluation of Blacker

testified at the hearing. In an entry dated September 8, 2021, the trial court found that Blacker was incompetent to stand trial and there was a substantial probability that Blacker would become competent to stand trial within one year if he was provided with a course of treatment. The trial court ordered Blacker to undergo treatment at Twin Valley.

{¶ 22} Blacker received treatment at Twin Valley from October 2021 to January 2022. After Blacker received treatment, a second licensed clinical psychologist evaluated him. The second psychologist opined Blacker had the capacity to understand the nature and objective of the legal proceedings against him and assist in his own defense. The psychologist indicated that she understood Blacker had a history of uncooperative behavior. According to the psychologist, Blacker's intermittent refusals to cooperate were not due to the presence of a psychotic thought process, paranoia, or cognitive disorganization. Rather, Blacker's uncooperative or less than fully cooperative behavior was volitional and instrumental in achieving his desired goal(s) of the moment. Thus, the psychologist concluded, Blacker had the ability to assist in his defense and cooperate with his attorney if he chose to do so.

{¶ 23} On April 11, 2022, the trial court held a second competency hearing, at which the second psychologist testified. The second psychologist explained that Blacker had been diagnosed with antisocial personality disorder, which is a personality disorder and not a mental illness. The psychologist opined that Blacker's antisocial personality disorder did not prevent him from exercising good judgment when he chose to do so. She also opined that Blacker was not claiming that he was dead based on a delusion.

{¶ 24} At the conclusion of the hearing, the trial court expressed concern that the two psychologists who had evaluated Blacker had reached contradictory opinions regarding Blacker's competency to stand trial. The trial court also was troubled that Blacker received prescription medication for a mental health condition, yet the second psychologist found he was not mentally ill. Given these issues, the trial court ordered that Blacker undergo a third evaluation, pursuant to R.C. 2945.371(A), in an entry dated May 25, 2022.

{¶ 25} The third licensed clinical psychologist to evaluate Blacker found him capable of understanding the nature and objective of the legal proceedings against him and assisting counsel in his defense. The third psychologist deemed Blacker's thought processes logical and coherent, but consistent with an alternative world view: the sovereign citizen

movement. According to the psychologist, Blacker rejected much of the court process based on his adherence to sovereign citizen principles, not mental illness. The psychologist opined that, although Blacker's identification with the sovereign citizen movement might make him appear delusional and disorganized, it did not prevent him from understanding the nature and objective of the court proceedings. Moreover, the psychologist concluded that Blacker was choosing not to engage with his attorney based on his philosophical alignment with the sovereign citizen movement.

{¶ 26} On September 7, 2022, the trial court held a third competency hearing. Both parties stipulated to the third competency report. The trial court accepted the stipulations and, based on the report, found Blacker competent to stand trial. The trial court issued an entry on September 9, 2022 memorializing its finding.

{¶ 27} The trial court set trial for October 31, 2022. The trial court, however, had to continue the trial when Blacker filed a civil suit against his attorney, the prosecutor, and the trial judge. Blacker's pending action against his attorney created a conflict of interest that had to be resolved before trial could commence. The trial court rescheduled the trial for February 21, 2023.

{¶ 28} In late January 2023, Blacker sent a letter to his attorney, at his attorney's home address, that informed his attorney that if he did not withdraw, Blacker would file bar complaints, malpractice lawsuits, and other, similar actions. In a motion to withdraw as Blacker's counsel, Blacker's attorney told the trial court he was "concerned that Defendant has apparently taken great efforts to locate counsel's home address rather than sending correspondence to his office, and view[ed] this as a thinly veiled threat to counsel and his family." (Jan. 26, 2023 Mot. to Withdraw from Representation at 2.) The trial court granted the attorney's motion to withdraw.

{¶ 29} On February 14, 2023, Blacker filed a pro se discovery motion. A week later, on February 21, 2023, Blacker and the prosecutor appeared before the trial court on the scheduled trial date. The trial court began the proceedings by asking Blacker if he wished to represent himself or have the court appoint new counsel for him. Blacker answered that he wanted to immediately proceed to trial, but he did not want to waive his right to counsel. When the trial court probed further, Blacker said, "I don't want counsel. I don't need counsel. * * * I'm ready for the trial. Let's have it today. You understand that? How hard

is it? What else can I say?" (Feb. 21, 2023 Tr. at 5-6.) The trial court then reviewed with Blacker the challenges he would encounter proceeding pro se, the court's ability to appoint standby counsel, and the charge against him and the potential sentence he could receive. Blacker became extremely obstreperous, arguing that the trial court should have dismissed his case for lack of subject-matter jurisdiction and the Ohio Revised Code is not the law in Ohio. He announced he did not want counsel, but he would not sign a waiver. After Blacker repeatedly insulted the trial court, the court told him, "Mr. Blacker, look, your trial date is going to be March 20. You're going to trial that day." *Id*. at 21. Blacker then decided that he would sign the form waiving counsel, albeit with the phrase "vis compulsitiva."[1] (Feb. 21, 2023 Waiver of Counsel). After signing the waiver, Blacker raised the issue of his February 14, 2023 discovery request. The trial court told Blacker that the state would now respond to his discovery request because he was officially representing himself.

{¶ 30} On March 10, 2023, Blacker was brought to court so he could review a DVD that contained certain discovery materials he had requested. The prosecutor also provided Blacker with documents responsive to his discovery requests.

{¶ 31} On the March 20, 2023 trial date, Blacker asked the trial court to appoint him new counsel. The newly appointed counsel immediately moved for a continuance of the trial, which the trial court granted. The trial court reset trial for May 1, 2023.

{¶ 32} A jury trial on the felonious assault count commenced, as scheduled, on May 1, 2023. The jury found Blacker guilty. In a separate, subsequent proceeding, the trial court found Blacker guilty of the repeat violent offender specification. In a judgment entered May 11, 2023, the trial court convicted Blacker and sentenced him to an indefinite mandatory term of 8 to 12 years' imprisonment on the felonious assault count, plus an additional mandatory consecutive term of 10 years' imprisonment on the repeat violent offender specification.

---

[1] Presumably, Blacker meant to use the Latin phrase "vis compulsiva," which means "[f]orce exerted to compel another to do something involuntarily; menacing force exerted by terror." *Black's Law Dictionary* 1802 (10th Ed.2014). Blacker falsely stated on the record that, as he was signing the waiver, a deputy was "standing here with his hand on a gun" and "there's another guy over here behind me trying to * * * impose some kind of threat towards me." (Feb. 21, 2023 Tr. at 22-23.) The trial court clarified that the deputy did "*not*" have his hand on his gun and the so-called threatening "guy" was just waiting to retrieve his pen from Blacker. (Emphasis added.) *Id*.

## II. ASSIGNMENTS OF ERROR

{¶ 33} Blacker now appeals the May 11, 2023 judgment, and he assigns the following errors:

[1.] APPELLANT'S STATUTORY SPEEDY TRIAL RIGHTS AND HIS CONSTITUTIONAL SPEEDY TRIAL RIGHTS WERE VIOLATED IN CONTRAVENTION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

[2.] APPELLANT'S RIGHTS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND *MIRANDA V. ARIZONA*, 384 U.S. 436 (1966) WERE VIOLATED WHEN EVIDENCE OF APPELLANT'S POST-ARREST SILENCE WAS ADMITTED INTO EVIDENCE BY THE STATE.

[3.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT REFUSED TO INSTRUCT THE JURY ON THE INFERIOR OFFENSE OF AGGRAVATED ASSAULT IN VIOLATION OF OHIO LAW.

[4.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUIONS.

[5.] APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

[6.] THE TRIAL COURT ERRED IN PERMITTING THE ALLEGED VICTIM TO SHOW THE JURY HER WOUNDS ON REDIRECT. SAID ERROR DEPRIVED APPELLANT OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.

[7.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED

A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AS TO THE REPEAT VIOLENT OFFENDER SPECIFICATION, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

## III. LEGAL ANALYSIS

### A. First Assignment of Error – Violation of Speedy Trial Rights

{¶ 34} Article I, Section 10 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant the right to a speedy trial by the state. A criminal defendant also has a statutory right to a speedy trial under R.C. 2945.71 to 2945.73, which implement the constitutional speedy trial protections. *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, ¶ 13.

#### 1. Statutory Right to a Speedy Trial

{¶ 35} Blacker first argues that the state violated his statutory right to a speedy trial. To preserve a statutory speedy-trial argument for appeal, a defendant must file a motion to dismiss on speedy-trial grounds "at or prior to the commencement of trial." R.C. 2945.73(B)(1);[2] *accord State v. Stanford*, 10th Dist. No. 21AP-351, 2024-Ohio-1451, ¶ 39. In this case, Blacker twice alluded to his speedy-trial rights prior to trial. First, on October 12, 2022, Blacker filed a pro se demand for a "fast and speedy trial," in which he purported to rescind any previous waiver of his speedy-trial rights. (Oct. 12, 2022 Demand for Fast & Speedy Trial.) Second, during the March 10, 2023 hearing, Blacker objected that the February 21, 2023 continuance entry stated that "[d]efendant waives * * * the right to a speedy trial * * * for the period of this continuance." (Mar. 10, 2023 Tr. at 7.) Blacker, therefore, sought to protect his speedy-trial rights, but he never moved for a dismissal based on his statutory speedy-trial right. A defendant, like Blacker, who fails to move for dismissal pursuant to R.C. 2945.73(B) is limited to a claim for plain error on appeal. *Stanford* at ¶ 39-40; *State v. Simms*, 10th Dist. No. 05AP-806, 2006-Ohio-2960, ¶ 10.

{¶ 36} To prevail under the plain-error standard, a defendant must show that an error occurred, the error was obvious, and there is a reasonable probability that the error

---

[2] Amendments to R.C. 2945.71, 2945.72, and 2945.73 became effective in April 2023. Because the amended provisions are not applicable to Blacker, we reference the statutory speedy-trial provisions in effect prior to the 2023 amendments.

resulted in prejudice, meaning that the error affected the outcome of the trial. *State v. Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, ¶ 8. An appellate court has discretion to notice plain error and will correct such error only under exceptional circumstances to prevent injustice. *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, ¶ 17.

{¶ 37} Under R.C. 2945.71(C)(2), a person charged with a felony "[s]hall be brought to trial within two hundred seventy days after the person's arrest." If that person is held in jail in lieu of bond, then each day in custody must be counted as three days. R.C. 2945.71(E). "Speedy-trial provisions are mandatory, and courts must strictly enforce them." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 81. If the defendant is not brought to trial within the allotted time, then the trial court must discharge the defendant upon a timely motion. R.C. 2945.73(B).

{¶ 38} A defendant establishes a prima facie violation of his statutory speedy-trial right by showing that more than 270 days elapsed between his arrest and trial. *State v. Williams*, 10th Dist. No. 18AP-891, 2023-Ohio-1002, ¶ 14; *State v. Boyce*, 10th Dist. No. 19AP-313, 2021-Ohio-712, ¶ 11. Once a defendant establishes a prima facie violation, the state bears the burden of proving the tolling of the time within which the defendant must be tried. *Williams* at ¶ 14; *Boyce* at ¶ 11. R.C. 2945.72 provides several events and circumstances that toll the running of a defendant's speedy-trial time, thus extending the time for bringing the defendant to trial. *State v. Martin*, 156 Ohio St.3d 503, 2019-Ohio-2010, ¶ 15. Alternatively, the state may establish that the defendant has waived his speedy-trial rights and, thus, the days included in the waiver period do not count toward the deadline for bringing the defendant to trial. *Williams* at ¶ 16. Therefore, on review of a speedy-trial claim, an appellate court counts the days of delay chargeable to either side and determines whether the case came to trial within the applicable time limit. *State v. Sanchez*, 110 Ohio St.3d 274, 2006-Ohio-4478, ¶ 8.

{¶ 39} Here, Blacker was arrested for the felonious assault of Betsy on March 5, 2021. His trial on that count did not begin until May 1, 2023. The day of arrest does not count when computing speedy-trial time. *Adams* at ¶ 82, fn. 7. Because Blacker was incarcerated during the entire period between his arrest and trial, he is entitled to triple count the 787 days that elapsed, for a total of 2,361 days. Blacker, therefore, has established a prima facie speedy-trial violation.

{¶ 40} In response, the state contends a series of tolling and waiver events occurred that extended the speedy-trial time. However, the state begins its analysis by conceding that this court should charge it with the days between Blacker's arrest and his initial discovery request. Blacker filed his initial discovery request on March 23, 2021. From March 6, 2021 (the day after Blacker's arrest) to March 23, 2021, 18 days elapsed, so we charge 54 days (18 days x 3 = 54 days) to the state.

{¶ 41} A defendant's request for discovery operates as a tolling event. *State v. Belville*, 171 Ohio St.3d 5, 2022-Ohio-3879, ¶ 18. "A discovery request tolls speedy-trial time for a reasonable amount of time necessary to allow the state to respond to the request." *Id*. at ¶ 21. Here, the state responded to Blacker's discovery requests on May 5, 2021. Blacker does not dispute that the state responded in a reasonable time. Therefore, the speedy-trial time is tolled from March 23, 2021 to May 5, 2021.

{¶ 42} Although the state's response to the discovery requests would normally restart the speedy-trial clock, an event occurred on May 6, 2021 that kept the clock from ticking. On that date, defense counsel signed a continuance entry, which postponed trial until July 12, 2021. The continuance entry stated that it waived Blacker's right to a speedy trial for the period of the continuance.

{¶ 43} A defendant is bound by his counsel's actions in waiving speedy-trial rights when agreeing to a continuance, even over the defendant's objections. *Stanford*, 10th Dist. No. 21AP-351, 2024-Ohio-1451, at ¶ 41; *Williams*, 10th Dist. No. 18AP-891, 2023-Ohio-1002, at ¶ 24. Therefore, we do not include the period of the continuance—May 6, 2021 to July 12, 2021—in the speedy-trial time.

{¶ 44} On July 12, 2021, the trial court sua sponte raised the issue of Blacker's competency to stand trial. R.C. 2945.72(B) provides that the speedy-trial time may be extended by "[a]ny period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined." Based on R.C. 2945.72(B), the state argues that the speedy-trial time was tolled from the date the trial court raised the issue of Blacker's competency on July 12, 2021 until the trial court determined Blacker to be competent to stand trial on September 9, 2022.

{¶ 45} We begin our analysis by reviewing the complicated process of determining a defendant's competency to stand trial. The trial court, prosecutor, or defense may raise

the issue of the defendant's competency to stand trial.  R.C. 2945.37(B).  "If the issue [of competency] is raised before the trial has commenced, the court shall hold a hearing on the issue." *Id.*  Given the statute's use of the word "shall," "[t]he statute is clear that a hearing is mandatory when 'the issue [of competency] is raised before the trial.' " *State v. Hough*, 169 Ohio St.3d 769, 2022-Ohio-4436, ¶ 22, quoting R.C. 2945.37(B).

{¶ 46} If the issue of the defendant's competency is raised, "the court may order one or more evaluations of the defendant's present mental condition" by a psychiatrist or a licensed clinical psychologist.  R.C. 2945.371(A).  As the statute provides that a trial court "may" order evaluations of a defendant, the ordering of evaluations is a matter within the discretion of the trial court.  *State v. Patton*, 10th Dist. No. 08AP-800, 2009-Ohio-1382, ¶ 8.  Therefore, an appellate court will not reverse a trial court's decision ordering a competency evaluation absent an abuse of discretion.  *Id.*

{¶ 47} If a trial court orders an evaluation, it must conduct a hearing ten days after the examiner files a report of the evaluation.  R.C. 2945.37(C).  At the hearing, the trial court must determine by a preponderance of the evidence whether the defendant has the capacity to understand the nature and objective of the proceedings against him and to assist in his defense.  R.C. 2945.37(G).  If the trial court determines that the defendant lacks either capacity and, consequently, is incompetent to stand trial, the court must enter one of the orders authorized by R.C. 2945.38(B).  *Id.*  R.C. 2945.38(B)(1)(a) permits a trial court to order the defendant to undergo treatment if the defendant is charged with a felony offense and the trial court finds the defendant is incompetent to stand trial, but there is a substantial probability the defendant will become competent to stand trial within one year if he is provided with a course of treatment.

{¶ 48} After the defendant receives treatment, the person who supervises the treatment of the defendant must file a report evaluating the defendant's mental health with the trial court.  R.C. 2945.38(F) & (G).  The trial court must then hold a hearing regarding the defendant's competency.  R.C. 2945.38(H).  The trial court must also hold a hearing within ten days after the expiration of the maximum time for the defendant's treatment.  *Id.*  If the trial court determines at the hearing that the defendant is competent to stand trial, the defendant shall be proceeded against as provided by law.  R.C. 2945.38(H)(1).

{¶ 49} In this case, the trial court initially raised the issue of Blacker's competency at the July 12, 2021 hearing. In a judgment entry dated July 27, 2021, the trial court ordered Blacker to undergo a mental health evaluation. The trial court held a hearing on September 8, 2021 regarding Blacker's competency to stand trial. In a judgment entry issued the same date as the hearing, the trial court found Blacker incompetent to stand trial, but the court also found that there was a substantial probability that Blacker would become competent within one year if he was provided with treatment. The trial court ordered that Blacker receive treatment at Twin Valley.

{¶ 50} On April 14, 2022, the trial court held a second hearing regarding Blacker's competency after receiving a second evaluation of Blacker's mental health. As a result of that hearing, the trial court issued a judgment entry dated May 25, 2022 that required Blacker to undergo a third mental health evaluation. A third hearing regarding Blacker's competency occurred on September 7, 2022 after the trial court received the third mental health evaluation. In a judgment entry dated September 9, 2022, the trial court found that Blacker understood the nature and objective of the proceedings against him and could assist in his defense. Thus, the trial court concluded that Blacker was competent to stand trial and ordered Blacker's case set for trial.

{¶ 51} As we stated above, R.C. 2945.72(B) provides that the speedy-trial time may be extended by "[a]ny period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined." "The express language of R.C. 2945.72(B) is broadly worded to include any period in which the accused's mental competency is being determined." *State v. Palmer*, 84 Ohio St.3d 103, 106 (1998). Once the issue of competency is raised, "the tolling provision of R.C. 2945.72(B) comes into play." *Id.* "This is true even when the trial court raises the issue of competence sua sponte." *State v. Bailey*, 4th Dist. No. 14CA3461, 2015-Ohio-5483, ¶ 32. "The tolling of R.C. 2945.72(B) continues until the trial court makes a competency determination." *Palmer* at paragraph two of the syllabus.

{¶ 52} Based on the timeline of this case, the issue of competency was raised on July 12, 2021 and the trial court made a final competency determination on September 9, 2022. Thus, pursuant to R.C. 2945.72(B), that period was tolled because Blacker's "mental competency to stand trial [was] being determined."

{¶ 53} Despite the express language of R.C. 2945.72(B) and its interpretation in *Palmer*, this court and others have held that the tolling provision of R.C. 2945.72(B) does not apply if the trial court abuses its discretion in ordering an initial mental health evaluation. *State v. Saunders*, 2d Dist. No. 2022-CA-21, 2022-Ohio-4739, ¶ 22; *State v. Cook*, 5th Dist. No. 2015CA00090, 2016-Ohio-2823, ¶ 83; *State v. Ridley*, 6th Dist. No. L-10-1314, 2013-Ohio-1268, ¶ 19; *Patton*, 10th Dist. No. 08AP-800, 2009-Ohio-1382, at ¶ 10; *Columbus v. Cardinal*, 10th Dist. No. 04AP-229, 2004-Ohio-6605, ¶ 3. This holding seems contrary to the plain language of R.C. 2945.72(B), which tolls the speedy-trial time during the period "mental competence to stand trial is being determined" without exception. Nevertheless, we will evaluate whether the trial court abused its discretion in ordering the first evaluation of Blacker to determine the viability of the R.C. 2945.72(B) extension to the speedy-trial time.

{¶ 54} When the trial court ordered Blacker to undergo the first evaluation, it was aware that competency issues had arisen in Blacker's prior criminal proceedings. During a May 6, 2021 bond modification hearing, Blacker's attorney informed the trial court that "[t]he nature of my previous representation of [Blacker] involved some trips back and forth to Twin Valley." (May 6, 2021 Tr. at 4.) Defense counsel expressed confidence in Blacker's current competency because Blacker had assured him he was taking his medication. However, two months later, at the July 12, 2021 hearing, Blacker announced that he was not Nathanial Blacker and Nathanial Blacker had "been dead since 2009." (July 21, 2021 Tr. at 13.) Blacker also claimed he was "a trustee for the dead traveler trust," presumably for the deceased Nathanial Blacker. *Id.* at 11. Blacker asserted that the trial court could find proof of his statements in a financing statement contained on the Ohio Secretary of State's website, although Blacker's attorney could not locate the financing statement when he searched during the hearing.

{¶ 55} Given Blacker's mental health history and bizarre claims, we conclude that the trial court did not abuse its discretion in ordering the first mental health evaluation. Consequently, the period between July 12, 2021, when the trial court raised Blacker's competency, and September 8, 2021, the date of the hearing following the first evaluation, was tolled pursuant to R.C. 2945.72(B).

{¶ 56} Blacker next argues that this court should evaluate each subsequent competency ruling the trial court made and, if we find an abuse of discretion, count the time following that ruling against the state. Blacker, however, cites no precedent for this course of action. More importantly, R.C. 2945.72(B) flatly contradicts it. According to that statute, speedy-trial time is extended when "the accused is mentally incompetent to stand trial" in addition to when the accused's "mental competence to stand trial is being determined." R.C. 2945.72(B). Here, the trial court found Blacker incompetent to stand trial in its September 8, 2021 judgment entry. Blacker remained incompetent to stand trial until the trial court's September 9, 2022 judgment entry found him competent. By virtue of those two judgment entries, the period between September 8, 2021 and September 9, 2022 was tolled.

{¶ 57} The state concedes the speedy-trial clock next ran from September 10, 2022 to October 31, 2022, when the trial court continued the trial date to February 21, 2023 at defense counsel's request. Between September 10 and October 31, 2022, 52 days elapsed, thus adding 156 days to the time chargeable to the state (52 days x 3 = 156 days). The clock stopped on October 31, 2022 because time is tolled during "[t]he period of any continuance granted on the accused's own motion." R.C. 2945.72(H).

{¶ 58} The state asserts that time remained tolled on February 21, 2023 because, on that date, the trial court granted defendant's request for a continuance of the trial date to March 20, 2023. Thus, the state argues, R.C. 2945.72(H) continued to extend the speedy-trial time. Blacker, however, maintains that he did not request the continuance, so the speedy-trial clock should restart.

{¶ 59} In full, R.C. 2945.72(H) extends the time within which an accused must be brought to trial by "[t]he period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion." When determining whether tolling under R.C. 2945.72(H) applies, "[r]eviewing courts must focus on the underlying source of the delay." *Martin*, 156 Ohio St.3d 503, 2019-Ohio-2010, at ¶ 25.

{¶ 60} In the February 21, 2023 hearing, Blacker did not request a continuance of the trial date. Rather, the trial court told him that it was postponing his trial until March 20, 2023. (*See* Feb. 21, 2023 Tr. at 21 ("Mr. Blacker, look, your trial date is going to be

March 20.  You're going to trial that day.")).  We assume the trial court decided to postpone the trial when it did not know prior to the start of the February 21, 2023 proceedings if Blacker wanted to represent himself or have the court appoint new counsel.  Nothing in the record, however, confirms this assumption or otherwise explains the trial court's rationale for its decision to delay trial.  In these circumstances, we cannot conclude that R.C. 2945.72(H) applies.

{¶ 61}  Nevertheless, another tolling event occurred during this time.  On February 14, 2023, Blacker filed a discovery request.  As we explained above, a defendant's request for discovery operates as a tolling event.  *Belville*, 171 Ohio St.3d 5, 2022-Ohio-3879, at ¶ 18.  The state responded to Blacker's discovery request on March 10, 2023.  We conclude that 24 days is a reasonable time in which to respond to a defendant's discovery request.  *See State v. Squillace*, 10th Dist. No. 15AP-958, 2016-Ohio-1038, ¶ 15 (concluding 24 days was a reasonable time for the state's discovery response).  Therefore, the period from February 21, 2023, when the continuance expired, and March 10, 2023, when Blacker received the discovery responses, was tolled.

{¶ 62}  The speedy-trial clock ran again from March 11, 2023 to March 20, 2023, during which 10 days elapsed, resulting in 30 days chargeable to the state (10 days x 3 = 30 days).  On March 20, 2023, Blacker requested the trial court appoint him counsel.  The newly appointed counsel immediately requested, and received, a continuance of the trial date.  That continuance tolled the speedy-trial time under R.C. 2945.72(H).  Trial commenced, as scheduled, on May 1, 2023.

{¶ 63}  After removing the time tolled and waived, 240 days of Blacker's speedy-trial time had run as of the trial date.  Consequently, no statutory speedy-trial violation occurred.

### 2. Constitutional Right to a Speedy Trial

{¶ 64}  Blacker next argues that the trial court violated his constitutional rights to a speedy trial.  Because Blacker did not raise this argument in the trial court, he has waived all but a plain-error review.  *State v. Hicks-Stevens*, 8th Dist. No. 112329, 2023-Ohio-4307, ¶ 12; *State v. Wells*, 8th Dist. No. 85586, 2006-Ohio-87, ¶ 18.

{¶ 65}  To determine whether a defendant's constitutional rights to a speedy trial were violated, a court considers four factors:  (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) the

prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Selvage*, 80 Ohio St.3d 465, 467 (1997).

**{¶ 66}** The first of these factors, the length of the delay, "is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker* at 530. Generally, a delay that approaches one year is presumptively prejudicial. *Doggett v. United States*, 505 U.S. 647, 652 (1992), fn. 1; *State v. Long*, 163 Ohio St.3d 179, 2020-Ohio-5363, ¶ 14.

**{¶ 67}** In this case, Blacker's trial began approximately two years after his arrest. Therefore, the delay qualified as presumptively prejudicial, and we will consider the other three factors to determine if Blacker's constitutional speedy-trial rights were violated.

**{¶ 68}** The second factor focuses on whether the government or the criminal defendant is more to blame for the delay. *Doggett* at 651. In assigning culpability for delay, a court should weigh differently the various reasons given for the delay. *Barker* at 531. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." *Id.*

**{¶ 69}** With regard to this factor, Blacker challenges the delay caused by the competency proceedings. Blacker argues that ensuring his competency to stand trial is not a valid reason to delay trial. To the contrary, the government has valid reason to protect a defendant's right not to be tried and convicted while incompetent to stand trial. *United States v. Pina*, 724 Fed.Appx. 413, 421 (6th Cir.2018). Because the delay Blacker complains about was justified, this factor weighs in the state's favor.

**{¶ 70}** Under the third factor, a court considers "whether, in due course, the defendant asserted his right to a speedy trial." *Doggett* at 651. A defendant's assertion of his speedy-trial right is entitled to strong evidentiary weight in determining whether the defendant is being deprived of that right. *Barker* at 531-32. Conversely, the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy

trial." *Id.* at 532. A defendant properly asserts his constitutional rights to a speedy trial by filing a motion to dismiss the indictment. *Wilson v. Mitchell*, 250 F.3d 388, 396 (6th Cir.2001).

{¶ 71} Here, Blacker never moved for dismissal based on his constitutional rights to a speedy trial. Instead, at various points prior to trial, Blacker demanded a speedy trial or objected to waiving his rights to a speedy trial. However, Blacker's own actions undercut any assertions he made of his rights to a speedy trial. For example, Blacker filed a pro se demand for a "fast and speedy trial" on October 12, 2022. However, only weeks later, on October 31, 2022, Blacker's attorney had to seek a continuance of trial because Blacker had filed a civil action against his attorney, creating a conflict of interest that precluded trial from proceeding. Later, Blacker's threats caused his attorney to request leave of court to withdraw, which the trial court granted, causing more delay. "Requesting continuances after asserting the right to a speedy trial diminishes the weight given to the defendant's" assertion of the right. *State v. Day*, 10th Dist. No. 18AP-265, 2019-Ohio-1327, ¶ 16. Therefore, while we weigh this factor in Blacker's favor because he did raise his right to a speedy trial, the weight we assign to this factor is slight.

{¶ 72} The fourth factor a court weighs is prejudice, which a court assesses in light "of the interests of defendants which the speedy trial right was designed to protect." *Barker* at 532. Those interests are: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

{¶ 73} Blacker argues that the delay in this case is presumptively prejudicial, so he does not have to present affirmative proof of particularized prejudice. We disagree.

{¶ 74} In *Doggett*, the United States Supreme Court addressed the amount of prejudice that a defendant must prove to establish a constitutional speedy-trial violation. Where the government pursues a defendant with reasonable diligence, a defendant must "show specific prejudice to his defense." *Doggett*, 505 U.S. at 656. A presumption of prejudice, however, may exist where the government is negligent in bringing the accused to trial because "negligence [is not] automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him." *Id.* at 657. "[N]egligence

unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice." *Id.* Where the government's negligence led to a six-year delay in the prosecution of the defendant, the Supreme Court presumed prejudice to the defendant. *Id.* at 658.

{¶ 75} In this case, Blacker has not demonstrated that any of the pretrial delay is attributable to the government's negligence. Even assuming he had established governmental negligence, a two-year delay does not constitute the kind of lengthy delay that permits a presumption of prejudice, thus relieving a defendant of the burden of affirmatively proving prejudice. *See United States v. Moreno*, 789 F.3d 72, 82 (2d Cir.2015), fn. 10 (holding a 27-month delay was not so long as to cause presumptive prejudice that relieved the defendant of the burden of affirmatively showing prejudice); *United States v. Toombs*, 574 F.3d 1262, 1275 (10th Cir.2009) (holding a 22-month delay insufficient to allow a court to presume prejudice); *Goodrum v. Quarterman*, 547 F.3d 249, 260 (5th Cir.2008) ("the *Doggett* presumption applies only where the delay is at least 5 years"). Consequently, Blacker must present affirmative proof of particularized prejudice.

{¶ 76} To prove prejudice, Blacker points to the two years that he spent incarcerated prior to trial. While Blacker does not offer any evidence that this detainment was unduly oppressive, we recognize that "[t]he time spent in jail awaiting trial has a detrimental impact on the individual." *Barker*, 407 U.S. at 532. Blacker also contends that he suffered anxiety and concern during the delay, but his only support for this contention is a complaint he made to the trial court that the court had taken two years of his life. Finally, Blacker maintains that the delay impaired his defense. He asserts that witnesses' memories faded, and he identifies 11 instances where witnesses testified that they could not recall facts when questioned at trial. However, in 10 of those 11 instances, the witnesses testifying were called to the stand by the state, and the faded memories arguably helped or, at least, did not harm, Blacker's defense. Moreover, Blacker does not explain how the eleventh instance—his testimony that he did not know if he could identify the bat he claimed Betsy brandished—resulted in prejudice to him. We thus conclude that Blacker's defense suffered no impairment. Given Blacker's incarceration, we weigh this factor in Blacker's favor, but as Blacker did not show the delay impaired his defense, this factor only favors Blacker slightly.

{¶ 77} None of the four factors is "either a necessary or sufficient condition to the finding of a deprivation of the right [to a] speedy trial." *Id.* at 533. "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Id.*

{¶ 78} In this case, the two-year delay between Blacker's arrest and trial was lengthy. Moreover, although Blacker never moved to dismiss on constitutional speedy-trial grounds, he did raise the speedy-trial issue to the trial court. On the other side of the scale, the length of the delay in this case does not approach the extraordinary periods of delay in cases where defendants have prevailed on constitutional speedy-trial claims. More importantly, most of the delay in this case is justified by the inquiry into and restoration of Blacker's competency. Finally, Blacker's defense was not impaired by the delay. After weighing all the circumstances, we conclude that Blacker was not deprived of his constitutional rights to a speedy trial.

{¶ 79} In sum, we conclude that Blacker has failed to establish any plain error or violation of his constitutional or statutory speedy-trial rights. Accordingly, we overrule his first assignment of error.

## B. Second Assignment of Error – Substantive Evidence of Post-Arrest, Pre-Miranda Silence

{¶ 80} By his second assignment of error, Blacker argues that the trial court erred in admitting into evidence testimony regarding his post-arrest silence. While we agree the admission of this evidence was error, we conclude that it did not amount to plain error.

{¶ 81} Blacker contends that the prosecution twice adduced evidence regarding his post-arrest silence during its case-in-chief. First, during the direct examination of Columbus Division of Police Detective Vincent Montgomery, the prosecutor asked the detective to describe his interaction with Blacker during his investigation. The detective answered, "[Blacker] was in the back of a cruiser. And after I had been in the house and went over to talk to him, he was not very talkative. You know, I asked him to step out. As he was stepping out, I took a couple photographs of him." (May 1, 2023 Tr. Vol. III at 355.) Second, twice during the redirect examination of Detective Montgomery, the prosecutor questioned the detective about Blacker's silence:

> Q.     [ ] You mentioned you spent a brief time with the
> defendant?

A.   Yes.

Q.   Did he say anything?

A:   Not that -- not that I can recall.   And then -- yeah, not that I can recall.

* * *

Q.   At any time in your interaction with the defendant, did he inform you that anyone that night attacked him?

A.   No, he did not.

(Tr. Vol. III at 386, 388.)

{¶ 82} Blacker asserts that these questions improperly introduced evidence of his post-arrest silence, thus violating his constitutional rights.   The state argues that these questions and the evidence they elicited were permissible.   The state points out that there is no evidence that Blacker received his *Miranda* warnings when arrested, and it argues that a prosecutor may permissibly introduce testimony of a defendant's post-arrest, pre-*Miranda* silence at trial.[3]

{¶ 83} Because Blacker did not object to the prosecutor's questions, we apply the plain-error standard of review.   As we stated above, to prevail under the plain-error standard, a defendant must show that an error occurred, the error was obvious, and there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial.   *Bailey*, 171 Ohio St.3d 486, 2022-Ohio-4407, at ¶ 8.   An appellate court has discretion to notice plain error and will correct such error only under exceptional circumstances to prevent injustice.   *Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, at ¶ 17.

{¶ 84} In *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147, the Supreme Court of Ohio addressed whether the use of a defendant's pre-arrest silence as substantive evidence of guilt violated the Fifth Amendment.   The Fifth Amendment to the United States Constitution states that no person "shall be compelled in any criminal case to be a witness

---

[3] In *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), the United States Supreme Court held that law enforcement must warn a person of his constitutional rights before questioning him, or the person's statements cannot be used at trial.

against himself." This provision applies to the states through the Fourteenth Amendment. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).

{¶ 85} In *Leach*, the Supreme Court of Ohio found the state had violated the defendant's Fifth Amendment privilege against self-incrimination when it introduced evidence in its case-in-chief that, before arrest, the defendant remained silent and/or asserted his right to counsel in response to questioning. *Id.* at ¶ 38. The Supreme Court of Ohio concluded that allowing a factfinder to infer a defendant's guilt from his silence undermined the very protections the Fifth Amendment was designed to provide. *Id.* at ¶ 31.

{¶ 86} Since the Supreme Court of Ohio decided *Leach*, the Fourth District Court of Appeals addressed the very issue now before this court: whether a trial court erred in admitting evidence of a defendant's post-arrest, pre-*Miranda* silence during the state's case-in-chief. The Fourth District concluded that:

> [T]he [Supreme C]ourt's reasoning [in *Leach*] applies even more strongly to a defendant's invocation of his Fifth Amendment rights while in custody but before receiving the *Miranda* warning. "To hold otherwise would encourage improper police tactics, as officers would have reason to delay administering *Miranda* warnings so that they might use the defendant's pre-arrest silence to encourage the jury to infer guilt." *Leach*, [2004-Ohio-2147], at [¶] 31. Furthermore, allowing the State to use defendants' pre-*Miranda* silence against them "would force defendants either to permit the jury to infer guilt from their silence or surrender their right not to testify and take the stand to explain their prior silence." *Id.*

*State v. Whitaker*, 4th Dist. No. 07CA3168, 2008-Ohio-4149, ¶ 32. The Fourth District thus held that "substantive use of the defendant's post-arrest, pre-*Miranda* invocation of the right to silence in the prosecution's case-in-chief violates the Fifth Amendment as incorporated by the Fourteenth Amendment." *Whitaker* at ¶ 32.

{¶ 87} We need not decide if the Fourth District properly expanded the holding of *Leach* to the situation before this court because, even if the state erroneously adduced evidence of Blacker's silence, Blacker is unable to demonstrate the requisite prejudice under the plain-error standard. Blacker argues that the evidence at issue prejudiced him because it suggested that he misrepresented how the stabbing occurred. According to Blacker, "the discrepancy between [his] exculpatory story at trial and silence at time of arrest [could] give[] rise to an inference that the story was fabricated somewhere along the way, perhaps

to fit within the seams of the State's case as it was developed at pretrial hearings." *Doyle v. Ohio*, 426 U.S. 610, 616 (1976). However, that type of prejudice could not arise in this case because Blacker explained his version of events to the police immediately upon his arrest. When being cuffed at the threshold of the South Roys house, Blacker told Officer Bell that Betsy was an "intruder," she had been "stealing stuff out of the house," "she tried to attack" Blacker, and Blacker "stabbed her." (State's Ex. D1 at 0:00:51.) Blacker just declined to repeat his story to a detective who approached him hours later as he sat in a police cruiser. Because Blacker had already disclosed his account of the stabbing, his testimony was not vulnerable to the inference that he concocted it later.

{¶ 88} Moreover, Blacker recalls his interaction with Detective Montgomery differently than Detective Montgomery recounts it. Blacker only remembers Detective Montgomery taking pictures of him after the stabbing. Blacker testified that Detective Montgomery "didn't want to talk to me at all. He never came and tried to interview me." (May 1, 2023 Tr. Vol. III at 470.) If Detective Montgomery never attempted to speak with Blacker, then Blacker's silence has no import at all.

{¶ 89} In sum, Blacker has not shown that the trial court committed plain error in admitting his post-arrest, pre-*Miranda* silence as substantive evidence at trial. Accordingly, we overrule the second assignment of error.

## C. Third Assignment of Error – Jury Instruction on Aggravated Assault

{¶ 90} By the third assignment of error, Blacker argues that the trial court erred in refusing to instruct the jury on the offense of aggravated assault. We disagree.

{¶ 91} Blacker was indicted with committing felonious assault in violation of R.C. 2903.11(A)(1), which states "[n]o person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn." R.C. 2903.12, which defines aggravated assault, provides in relevant part, "[n]o person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly * * * [c]ause serious physical harm to another or to another's unborn." R.C. 2903.12(A)(1). Given the statutory definitions of these two offenses, the offense of aggravated assault is an inferior degree of the indicted offense—felonious assault—because its elements are identical to those of the offense of felonious assault, although aggravated

assault also includes the mitigating element of serious provocation. *State v. Deem*, 40 Ohio St.3d 205, 210-11 (1988).

{¶ 92} An instruction on an inferior-degree offense is not warranted merely because a defendant offers some evidence going to the inferior-degree offense. *State v. Collins*, 10th Dist. No. 19AP-373, 2020-Ohio-3126, ¶ 49. A trial court is required to give an instruction on an inferior-degree offense only when there is "sufficient evidence to permit the jury to reasonably reject the greater offense and find the defendant guilty on the * * * inferior-degree offense." *State v. Nicholson*, ___ Ohio St.3d ___, 2024-Ohio-604, ¶ 162. When making this determination, a trial court must view the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence. *Id*.; *State v. Palmer*, 174 Ohio St.3d 561, 2024-Ohio-539, ¶ 21. An appellate court reviews a trial court's refusal to give a requested jury instruction for an abuse of discretion. *Nicholson* at ¶ 162; *State v. Lee*, 10th Dist. No. 17AP-908, 2018-Ohio-3957, ¶ 44.

{¶ 93} To warrant an instruction on the inferior-degree offense of aggravated assault, a defendant must present sufficient evidence of serious provocation occasioned by the victim that is reasonably sufficient to incite the defendant into using deadly force. *Deem* at paragraph four of the syllabus. Whether the provocation at issue was reasonably sufficient to prompt sudden passion or a sudden fit of rage requires both an objective and subjective analysis. *State v. Shane*, 63 Ohio St.3d 630, 634 (1992). First, a court must objectively consider whether the alleged provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage. *Id*. If the court concludes the objective standard is met, the court then examines whether the defendant in the particular case actually acted under the influence of sudden passion or in a sudden fit of rage. *Id*. The court only looks to the " 'emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time' " at the subjective stage of the analysis. *Id*., quoting *Deem* at paragraph five of the syllabus.

{¶ 94} For the provocation to be reasonably sufficient to prompt sudden passion or sudden fit of rage, "it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id*. at 635. Moreover, any passion or rage felt by a defendant who has time to cool off does not qualify for sudden passion or a sudden fit of rage. *State v. Hale*, 8th Dist. No. 113078, 2024-Ohio-1587, ¶ 104; *State v. Robinson*, 2d

Dist. No. 2021-CA-3, 2021-Ohio-3255, ¶ 12; *Lee* at ¶ 50. Depending on the circumstances, a cooling off period can be a very short time span. *Lee* at ¶ 51; *accord State v. Glenn*, 2d Dist. No. 27639, 2018-Ohio-2326, ¶ 26 ("even a very short period of reflection or disconnection from the heat of the moment constitutes a sufficient 'cooling off period' ").

{¶ 95} Here, the trial court found there was insufficient evidence to give an instruction on aggravated assault because it found "the passions of an ordinary person would [not] have been aroused beyond the power of his or her control given the situation." (May 1, 2023 Tr. Vol. III at 514.) We concur with this assessment.

{¶ 96} Blacker contends that experiencing a knife cut to the finger would have provoked an ordinary person into a sudden fit of rage. According to Blacker, Betsy swung a knife at him, and he sustained a cut to his finger when he batted the knife away. The cut at issue was minor enough that Blacker doctored it himself by wrapping his finger with furnace tape. Courts have found behavior like Betsy's insufficient to arouse the passions of an ordinary person beyond the power of his control. *State v. Noble*, 4th Dist. No. 15CA20, 2017-Ohio-1440, ¶ 38 (striking the defendant with the butt of a rifle would not constitute sufficient provocation); *State v. Howard*, 9th Dist. No. 26897, 2014-Ohio-1334, ¶ 25 (being grabbed on the arm and experiencing a cut in the process insufficient); *State v. Stewart*, 10th Dist. No. 10AP-526, 2011-Ohio-466, ¶ 13 (slamming a car door against the defendant not sufficient).

{¶ 97} Additionally, a reasonable person in Blacker's position would have had time to cool off after Betsy cut his finger. Blacker testified that after Betsy cut him, she left the bedroom, while he stayed in the bedroom to bandage his finger. Blacker then heard Betsy say, "I should just take that bat in there and bust his brains all over that wall." (May 1, 2023 Tr. Vol. III at 457.) At that point, Blacker chose to leave his bedroom and walk into the living room to confront Betsy. Consequently, even if the knife cut would have provoked a sudden fit of rage in an ordinary person, there was a cooling off period for that rage to dissipate. Although not much time elapsed between the time Betsy cut Blacker and Blacker confronted Betsy, the interlude provided the necessary lull for a sudden fit of rage to subside in any reasonable person.

{¶ 98} Because the provocation in this case was not reasonably sufficient to prompt a sudden fit of rage in an ordinary person, we conclude that the trial court did not abuse its

discretion in declining to instruct the jury on aggravated assault. We thus overrule the third assignment of error.

**D. Fourth Assignment of Error – Manifest Weight of the Evidence**

{¶ 99} By the fourth assignment of error, Blacker argues that his conviction for felonious assault is not supported by sufficient evidence and is against the manifest weight of the evidence. Because Blacker claimed self-defense, we can only review whether his conviction is against the manifest weight of the evidence. We conclude it is not.

{¶ 100} As we stated above, Blacker was indicted with committing felonious assault in violation of R.C. 2903.11(A)(1), which states "[n]o person shall knowingly * * * [c]ause serious physical harm to another or to another's unborn." Blacker does not dispute that he knowingly caused serious physical harm to Betsy by stabbing her 16 times. Blacker, instead, claimed at trial that he stabbed Betsy in self-defense.

{¶ 101} "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 25. If the defendant satisfies this burden, then the state must disprove at least one of the elements of self-defense beyond a reasonable doubt. *State v. Cumberlander*, 10th Dist. No. 23AP-90, 2024-Ohio-2431, ¶ 42. "The state's [] burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal." *Messenger* at ¶ 27. Because the state's burden is only one of persuasion—and not production—an appellate court cannot review a self-defense claim under the sufficiency of the evidence standard. *Id.* at ¶ 26-27.

{¶ 102} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving the conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Sitting as the 'thirteenth juror,' the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion." *State v. Jordan*, 174 Ohio St.3d 347, 2023-

Ohio-3800, ¶ 17.  However, the appellate court's authority to reverse on manifest-weight grounds " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' "  *Thompkins* at 387, quoting *Martin* at 175.

{¶ 103} The elements of a self-defense claim are: (1) the defendant was not at fault in creating the situation giving rise to the affray, (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid the danger.  *Messenger* at ¶ 14.  Self-defense claims generally turn on credibility issues.  *State v. Lee*, 10th Dist. No. 23AP-543, 2024-Ohio-4498, ¶ 20; *Cumberlander* at ¶ 49.  Evaluation of witnesses' credibility for the purposes of determining a self-defense claim is best done by the trier of fact.  *Lee* at ¶ 20; *Cumberlander* at ¶ 49.  A trier of fact is in the best position to consider inconsistencies, along with witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.  *Lee* at ¶ 20; *Cumberlander* at ¶ 49.  A conviction is not against the manifest weight of the evidence because a trier of fact believed the state's version of events over the defendant's version and rejected the defendant's claim of self-defense.  *Lee* at ¶ 20; *Cumberlander* at ¶ 49.

{¶ 104} In this case, Blacker argues that the verdict is against the manifest weight because his testimony, which establishes he acted in self-defense, is consistent with all the other evidence.  Blacker contends that Betsy's testimony regarding what happened is unbelievable because her testimony is inconsistent with the other evidence.  We are not persuaded by Blacker's analysis of the evidence.

{¶ 105} First, the record contains evidence that is inconsistent with Blacker's testimony.  When the police arrived at the South Roys house and arrested Blacker, Blacker told Officer Bell, "There's an intruder in the house up there.  I don't know what her name is.  She been here f***** -- she started stealing stuff out of the house and, uh, she tried to attack me, and I stabbed her."  (State's Ex. D1 at 0:00:51.)   While the last sentence may correspond generally with Blacker's recount of events, Blacker undeniably lied to the police in this statement because he knew Betsy's name.  Also, there was evidence contradicting Blacker's claim that Betsy was an intruder.  A.H. testified that Betsy was living at the South Roys house, and Betsy told Officer Bell on the morning of the stabbing that she was a

resident there as well. Furthermore, Betsy's mother testified to helping Betsy move her belongings out of the South Roys house after the stabbing.

{¶ 106} Additionally, the state refuted Blacker's claim of self-defense with two telephone calls made while Blacker was in jail prior to trial. In both calls, Blacker discussed his motivation for stabbing Betsy, but neither call included any mention of self-defense. Rather, Blacker told his ex-girlfriend that Betsy "was stealing * * * and I lost it. You know how many times I stabbed that b****? * * * I stabbed the f*** out of her." (State's Ex. J1 at 01:36.) In another call, Blacker said to his father, "I caught my significant other cheating on me and well, ah, you know, she got stabbed. * * * I don't tolerate adultery; you know what I mean?" (State's Ex. J2 at 01:06.)

{¶ 107} More importantly, the state presented evidence that correlated with Betsy's recall of the stabbing. A.H., the only witness to the stabbing, woke up to two people arguing. She saw Blacker punch and then stab Betsy as Betsy sat on the floor of the living room. Thus, she did not testify to the scene Blacker described: Betsy standing, holding a bat, and threatening Blacker, and then Blacker stabbing Betsy until she dropped the bat and fell to the floor. A.H., instead, corroborated Betsy's story that Betsy and Blacker had a verbal argument before Blacker punched and then stabbed Betsy as she sat on the living room floor at the coffee table.

{¶ 108} Blacker highlights that Betsy told the responding medic that she was sleeping when Blacker stabbed her. Betsy, however, testified that she did not remember giving this statement. Betsy spoke with Officer Bell approximately an hour after the stabbing and told him that she was in the living room, about to color at the coffee table, when Blacker came into the living room, she and Blacker exchanged some words, and then Blacker "flipped out." (State's Ex. D2 at 0:00:41.) This statement corresponds with Betsy's testimony at trial, showing the consistency of Betsy's account of the stabbing over time.

{¶ 109} After considering the totality of the evidence, we see no reason to disagree with the jury's determination that Blacker did not act in self-defense when he stabbed Betsy. This is not the exceptional case in which the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. We conclude, therefore, that Blacker's conviction for felonious assault is not against the manifest weight of the evidence. Accordingly, we overrule the fourth assignment of error.

**E. Fifth Assignment of Error – Ineffective Assistance of Counsel**

{¶ 110} By the fifth assignment of error, Blacker argues that he was deprived of effective assistance of counsel. We disagree.

{¶ 111} To prevail on an ineffective assistance claim, a defendant must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Id.* at 687; *State v. Bradley*, 42 Ohio St.3d 136, 141 (1989). To meet that requirement, the defendant must demonstrate that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland* at 687. Counsel's conduct is deficient if it falls below an objective standard of reasonable representation. *Id.* at 688; *Bradley* at 142.

{¶ 112} If the defendant shows that counsel's performance was deficient, then the second prong of the *Strickland* test requires the defendant to prove prejudice to prevail. *Strickland* at 687; *Bradley* at 141-42. To demonstrate prejudice, the defendant must show "that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694; *accord Bradley* at 142.

{¶ 113} First, Blacker argues that his trial counsel was ineffective for failing to move to dismiss on speedy-trial grounds. To demonstrate that counsel provided ineffective assistance by failing to move to dismiss for speedy-trial violations, a defendant must show that the motion would have a reasonable probability of success. *State v. Davis*, 4th Dist. No. 21CA6, 2023-Ohio-867, ¶ 38; *Cleveland v. Dancy*, 8th Dist. No. 107241, 2019-Ohio-2433, ¶ 23; *State v. Barbour*, 10th Dist. No. 07AP-841, 2008-Ohio-2291, ¶ 14, 17. Based on our resolution of Blacker's first assignment of error, we conclude that the trial court would have denied a motion to dismiss for violating defendant's speedy-trial rights. Therefore, the failure to file such a motion could not constitute ineffective assistance of counsel.

{¶ 114} Second, Blacker contends that his trial counsel was ineffective because he did not object when the prosecution elicited testimony from Detective Montgomery about Blacker's post-arrest, pre-*Miranda* silence. The failure to object, alone, is not enough to sustain a claim of ineffective assistance of counsel. *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, ¶ 117. Withholding an objection may be a tactical decision because:

> "[E]xperienced trial counsel learns that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

{¶ 115} In this case, trial counsel may have made a tactical choice to withhold an objection in order to avoid drawing the jury's attention to Detective Montgomery's testimony. However, even if counsel was deficient in not objecting, Blacker's ineffective assistance claim would still fail. As we explained above, no prejudice to Blacker resulted from the admission of evidence of Blacker's refusal to speak with Detective Montgomery. Trial counsel, therefore, was not ineffective for failing to object to Detective Montgomery's testimony.

{¶ 116} Third, Blacker maintains that his trial counsel was ineffective for not objecting when two state's witnesses testified that Blacker was jailed prior to trial. First, Blacker asserts that his counsel should have objected when Betsy testified that she "never sought [Blacker] out in jail" after the stabbing. (May 1, 2023 Tr. Vol. II at 273.) Second, Blacker contends that his counsel should have objected when the state introduced two of Blacker's jail phone calls through the testimony of Detective Montgomery. By explaining the method by which jail phone calls are made and recorded, Detective Montgomery provided the jury with enough information to infer that Blacker was an inmate at the jail.

{¶ 117} "[V]erbal references to the jail status of a defendant are improper and potentially prejudicial because they erode the presumption of innocence, for the same reason that wearing prison or jail clothing does." *State v. Stoermer*, 2d Dist. No. 2017-CA-93, 2018-Ohio-4522, ¶ 35; *accord State v. Rodriguez*, 8th Dist. No. 109320, 2021-Ohio-2580, ¶ 36; *State v. Graffius*, 7th Dist. No. 18 CO 0008, 2019-Ohio-2714, ¶ 35. "If there has been a reference to pretrial incarceration, the question then becomes whether the reference

prejudiced the defendant." *Stoermer* at ¶ 35. Generally, isolated comments from which a jury could infer the defendant was in jail are not enough to show prejudice. *Id.*

{¶ 118} Not objecting in this case could have been a reasonable trial strategy to avoid attracting the jury's attention to the brief references to Blacker's pre-trial incarceration. Additionally, the references the state's witnesses made to Blacker's stay in jail could not prejudice Blacker because Blacker also testified that he was jailed prior to trial. Blacker told the jury that, after the stabbing, the police "ended up taking me down here to the jail where I was booked into the jail." (May 1, 2023 Tr. Vol. III at 470.) Thus, we cannot conclude there is a reasonable probability that the results of Blacker's trial would have been different if Blacker's counsel had objected, as the jury would have known of Blacker's pre-trial incarceration from Blacker himself. Trial counsel, therefore, was not ineffective for failing to object to the state's witnesses' testimony that Blacker was jailed prior to trial.

{¶ 119} Finally, Blacker argues that trial counsel was ineffective based on the cumulative effect of his errors during trial. Under the cumulative error doctrine, an appellate court will reverse a conviction "when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 169. However, "when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Id.* at ¶ 170. In this case, we have found no merit in any of Blacker's claims for ineffective assistance of counsel and, thus, we reject his claim that the cumulation of his counsel's alleged errors resulted in ineffective assistance.

{¶ 120} In sum, Blacker has failed to demonstrate that his trial counsel provided ineffective assistance. Accordingly, we overrule Blacker's fifth assignment of error.

**F. Sixth Assignment of Error – Permitting the Victim to Show Her Scars**

{¶ 121} By his sixth assignment of error, Blacker argues that the trial court erred in permitting Betsy to show the jury her scars during redirect examination. We disagree.

{¶ 122} During the state's redirect examination of Betsy, the following occurred:

> Q. Are there still visible injuries on your body from the attack that happened almost two years ago?
>
> A. Yeah.

Q.      Are those scars?

A.      Yes.

Q.      Would you be comfortable showing the ladies and gentlemen of the jury the scars on your back?

[DEFENSE COUNSEL]:      Your Honor, I would object.  That is beyond the scope of cross-examination.

THE COURT:          It's overruled.
She can go ahead and do it.

Q.      * * * However you're comfortable.  If you want to raise up.

A.      (Witness complies.)

(May 1, 2023 Tr. Vol. II at 304.)

{¶ 123} On appeal, Blacker argues that the display of Betsy's scars was inadmissible evidence because it exceeded the scope of matters inquired into on cross-examination, and it was irrelevant and unfairly prejudicial.  We will address each argument in order.

{¶ 124} "The control of redirect examination is committed to the discretion of the trial judge and a reversal on that ground can be predicated upon nothing less than a clear abuse thereof."  *State v. Wilson*, 30 Ohio St.2d 199, 204 (1972).  Generally, the scope of redirect examination is limited to matters inquired into by the adverse party on cross-examination.  *State v. Ginley*, 8th Dist. No. 112641, 2024-Ohio-3294, ¶ 160; *State v. Waller*, 3d Dist. No. 13-22-10, 2023-Ohio-493, ¶ 8; *State v. Kean*, 10th Dist. No. 17AP-427, 2019-Ohio-1171, ¶ 82.  Nevertheless, a trial court may exercise its discretion to allow questions on redirect examination that exceed the parameters of cross-examination.  *Ginley* at ¶ 160; *Waller* at ¶ 8; *Kean* at ¶ 82.  In this case, we conclude that the trial court did not abuse its discretion in allowing the state to surpass the boundaries of cross-examination with a presentation of Betsy's scars.

{¶ 125} Although Blacker attacks the display of Betsy's scars on two additional grounds, he raised neither ground when objecting to the evidence at trial.  An objection on one ground does not preserve for appeal other, unmentioned grounds.  *State v. Bias*, 10th Dist. No. 21AP-329, 2022-Ohio-4643, ¶ 116; *State v. Petty*, 10th Dist. No. 15AP-950, 2017-

Ohio-1062, ¶ 49. Consequently, we apply the plain-error standard when reviewing whether the evidence at issue was inadmissible on relevancy or prejudice grounds.

{¶ 126} " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402.

{¶ 127} To prove felonious assault, the state had to prove Blacker caused "serious physical harm" to Betsy. *See* R.C. 2903.11(A)(1). "Serious physical harm to persons" includes "[a]ny physical harm that involves some permanent disfigurement." R.C. 2901.01(A)(5)(d). A scar is a permanent disfigurement. *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 15. Consequently, evidence of Betsy's scars was relevant to prove that Blacker caused Betsy serious physical harm. *See, e.g.*, *State v. Small*, 10th Dist. No. 82AP-576, 1982 Ohio App. LEXIS 12464, *9 (Dec. 28, 1982) (in a felonious assault case, holding that the trial court did not err in allowing the victim to display his wounds to the jury because "[e]vidence of the wounds to [the victim]'s body was relevant * * * to the issue of serious physical harm to [the victim]").

{¶ 128} Evid.R. 403, which addresses prejudicial evidence, manifests a definite bias in favor of admissibility. *State v. Marshall*, 10th Dist. No. 20AP-394, 2022-Ohio-3795, ¶ 20. Exclusion of evidence under Evid.R. 403(A) requires more than mere prejudice, because any evidence adverse to a party's case could be deemed prejudicial. *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 125. Consequently, Evid.R. 403(A) only mandates exclusion of "evidence that is *unfairly* prejudicial." (Emphasis sic.) *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 23. "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Id*. at ¶ 24. Usually, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect. *Id*.

{¶ 129} Blacker claims the display of Betsy's scars was prejudicial because it was memorable and evocative. The memorable nature of evidence does not render that evidence unfairly prejudicial. Evidence that overly engages a jury's emotion may be unfairly prejudicial, but we cannot judge whether the evidence at issue in this case falls into that category because we do not know what the jury saw. The record contains photographs of Betsy's wounds immediately after the stabbing, but no depiction of the scars the jury

viewed. Because Blacker did not make an objection or argument for this court to review, we cannot find the scars so graphic, as Blacker claims, that they would have induced an overly emotional response from the jury. *See*, *e.g.*, *State v. Grove*, 5th Dist. No. 2019 AP 08 0024, 2020-Ohio-1123, ¶ 30 (because defendant did not describe for the record the nature of the injuries the victim displayed to the jury, the appellate court would be compelled to conclude that the trial court exercised its discretion appropriately). Therefore, we conclude that the display of Betsy's scars was not unfairly prejudicial to Blacker.

{¶ 130} In sum, we find no error, much less plain error, in the admission of evidence of Betsy's scars. Accordingly, we overrule the sixth assignment of error.

## H. Seventh Assignment of Error – Repeat Violent Offender Specification

{¶ 131} By his seventh assignment of error, Blacker argues that the trial court erred in convicting Blacker of the repeat violent offender specification based on insufficient evidence. We disagree.

{¶ 132} " 'Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.' " *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, ¶ 23, quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in*, *Smith* at 102, fn. 4. "[A]n appellate court does not ask whether the evidence should be believed but, rather, whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.' " *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus.

{¶ 133} If an indictment specifies an offender is a repeat violent offender, a court shall determine whether the offender meets the statutory definition of repeat violent offender. R.C. 2941.149(A) & (B). A repeat violent offender is a person who: (1) is being sentenced for committing or complicity in committing aggravated murder, murder, any first- or second-degree felony that is an offense of violence, an attempt to commit any of

these offenses if the attempt is a first- or second-degree felony, or any substantially equivalent offense, and (2) was previously convicted of or pleaded guilty to one of the aforementioned offenses.  R.C. 2929.01(CC).

{¶ 134} By complying with R.C. 2945.75(B)(1), the state may prove a defendant has a previous conviction and, thus, establish the second part of the definition of repeat violent offender.  *State v. Brown*, 10th Dist. No. 10AP-836, 2011-Ohio-3159, ¶ 19 (R.C. 2945.75(B)(1) is not the sole method to prove a prior conviction but is a sufficient method to do so).  R.C. 2945.75(B)(1) provides, "[w]henever in any case it is necessary to prove a prior conviction, a certified copy of the entry of judgment in such prior conviction together with evidence sufficient to identify the defendant named in the entry as the offender in the case at bar, is sufficient to prove such prior conviction."  This court has interpreted R.C. 2945.75(B)(1) to require the state to "present both a certified copy of the prior judgment and evidence that the defendant named in the prior judgment is the defendant in the case at bar." *State v. Lumpkin*, 10th Dist. No. 05AP-656, 2006-Ohio-1657, ¶ 11.  Identical names alone are insufficient evidence to establish the necessary connection between a defendant in the case at bar and the previous conviction.  *State v. Greer*, 9th Dist. No. 26470, 2013-Ohio-4267, ¶ 22; *Lumpkin* at ¶ 16; *State v. Greene*, 6th Dist. No. S-01-015, 2001 Ohio App. LEXIS 5590 (Dec. 14, 2001).  Rather, because a social security number is a unique identifier, identical social security numbers, along with common birth dates, is evidence by which a finder of fact could conclude that the identity of a person to whom the documents refer is the same.  *Greer* at ¶ 22; *State v. Macalla*, 8th Dist. No. 88825, 2008-Ohio-569, ¶ 51; *Lumpkin* at ¶ 17; *State v. Robinson*, 3d Dist. No. 14-02-01, 2002-Ohio-2714, ¶ 24; *Greene*.

{¶ 135} In this case, the state presented the trial court with certified copies of two documents.  First, the state offered into evidence a Guernsey County Court of Common Pleas judgment entry, dated December 26, 2006, for case No. 04-CR-178 that names Blacker as the defendant.  In the judgment entry, the trial court states Blacker has been convicted of aggravated robbery, a first-degree felony in violation of R.C. 2911.01(A)(1), and it sentences him to a seven-year prison term.  Second, the state offered into evidence a Guernsey County indictment, dated December 4, 2004, charging "Nathanial C. Blacker" with two counts of aggravated robbery.

{¶ 136} Blacker argues that documents introduced by the state did not prove that the defendant named in those documents is the defendant in this case. We disagree. The Guernsey County indictment charging "Nathaniel C. Blacker" includes the same birth date and social security number as the defendant in this case. We conclude, therefore, that sufficient evidence proves that the defendant in the Guernsey County case and Blacker are the same person. Additionally, because the state adduced a certified copy of the Guernsey County judgment entry, as well as a certified copy of the underlying indictment containing the necessary identifying information, we conclude the state presented sufficient evidence to prove Blacker's prior conviction. Accordingly, we overrule the seventh assignment of error.

## IV. CONCLUSION

{¶ 137} For the foregoing reasons, we overrule each of appellant's seven assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

_____